14 So.2d 751

**STATE v. SABA.**

No. 36976.

June 21, 1943.

Osceola H. Carter, of Franklington, and Guy V. Rich, of Bogalusa, for defendant and appellant.

Eugene Stanley, Atty. Gen., Niels F. Hertz, Asst. Atty. Gen., and James T. Burns, Dist. Atty., of Covington, for the State, plaintiff and appellee.

ROGERS, Justice.

Collie Saba, Israel Simmons, Cloyce Holloway, and Delmer Kennedy, young white men, were indicted for kidnapping Mary Brister, a young negro woman. The crime charged was "simple kidnapping" denounced by Article 45 of the Criminal Code. When the case was called for trial, Israel Simmons was overseas, serving in the armed forces, and could not be reached by legal process. The district attorney obtained a severance as to Collie Saba, whose trial was then proceeded with in pursuance to the assignment. The case against Holloway and Kennedy was continued and reassigned for the first day of the next term of court. The trial of Saba resulted in his conviction and sentence to the penitentiary for five years.

Relying on two bills of exception, Saba has appealed from his conviction and sentence. One bill was reserved to the overruling of a motion for a continuance, and the other bill was reserved to the overruling of a motion for a new trial.

The motion for a continuance was predicated upon the absence of Israel Simmons, an alleged material witness who was one of the parties indicted with Saba. On November 2, 1942, counsel for Saba requested that a summons issue for Simmons, directing him to appear as a witness at the trial of the case on November 13, 1942. The sheriff's return shows that he was unable to

serve the summons for the reason that Simmons was then in the armed forces of the United States and had been sent overseas. The trial judge overruled the motion for the reason that the witness was beyond the jurisdiction of the court and that there was no assurance that he would in the near future, or even at any time, be amenable to the process of the court.

Article 322 of the Code of Criminal Procedure provides, among other requirements, that in order for defendant to obtain a continuance, he must show in his motion, by facts and circumstances, the probability that the witness may be had at the time to which the trial is deferred. And Article 324 of the Code of Criminal Procedure forbids the trial judge to grant an indefinite continuance, and directs him, if he grants the continuance, to fix the date upon which the trial shall be proceeded with, if practicable.

The attorneys for the defendant argue that the writers of the articles of the Code of Criminal Procedure did not contemplate the extraordinary conditions now prevailing as the result of the nation being engaged in a world-wide war. They argue that in view of these conditions, the provisions of Articles 322 and 324 of the Code of Criminal Procedure should not be stringently applied for the duration of the war. If their argument should prevail, it would mean that in many instances the criminal laws of this State could not be enforced until the end of the war. But their argument can not prevail. Aside from the uncertainty as to when Simmons may return to this country, if ever, the trial judge points out in his per curiam that inas-

much as Simmons is one of the parties jointly indicted with Saba, it is doubtful that he would consent to testify as a witness on Saba's behalf. The judge further points out that Holloway, who was also one of the parties indicted with Saba, when called to the stand as a witness for the defendant, availed himself of his constitutional right to refuse to testify on the ground that he might incriminate himself. It appears that the attorneys for the defendant obtained a written statement from Simmons before he left the State, but it appears also that the attorneys for the defendant had obtained a similar statement in writing from Holloway, who, when called to the stand, refused to testify. The trial judge, in overruling the motion for a continuance, took into consideration the doubt that Simmons would testify for Saba if he were present, in view of the fact that Holloway, who was present, refused to so testify.

Taking into consideration the uncertainty that Simmons would ever be available as a witness and the further uncertainty that he would testify for Saba, if he should become available, our conclusion is that the trial judge did not err in overruling defendant's motion for a continuance.

The motion for a new trial was founded upon allegations of newly discovered evidence. This evidence is stated in the motion to consist of the testimony of J. L. Strahan and J. P. Mitchell, who are working in a defense plant located in or near Mobile, Alabama. Affidavits of the prospective witnesses are attached to the motion.

In discussing the motion and the ruling of the trial judge refusing to grant the defendant a new trial we shall confine ourselves to the record, disregarding the many irrelevant statements of alleged facts contained in the briefs of counsel which form no part of the record.

The record shows that at about 5:30 o'clock in the morning of September 7, 1942, while in front of her home on Fifth A Street, in the City of Bogalusa, the young negro girl, Mary Brister, was forcibly seized, placed in an automobile, carried to a distance of some two miles beyond the city limits, and, as she testified, was criminally assaulted by four white men. These men were Collie Saba, the appellant, Cloyce Holloway, Israel Simmons, and Delmer Kennedy. They returned Mary Brister to a point approximately one block from her home about seven o'clock in the morning of the same day.

As shown by the per curiam of the trial judge, the affidavits of Strahan and Mitchell were apparently procured by Abraham Saba, a brother of the defendant, Collie Saba, who took an active interest in his defense and who was a co-worker with the affiants in the defense plant in Alabama.

The defendant submitted his motion for a new trial on the allegations of the motion, which were sworn to by him, and upon the affidavits of the two alleged newly discovered witnesses. He did not submit an affidavit by his brother Abraham Saba, and neither he nor Abraham Saba took the witness stand to support the allegations of his motion. The district attorney made no objection to the mode of procedure adopted by defendant.

After the district judge had granted counsel for defendant a delay of one week within which to apply for a motion for a new trial, the motion was filed and, in pursuance of the previous assignment, a hearing was had thereon. On this phase of the case, the minutes of the district court show the following: "On motion of counsel for defendant, the court ordered that defendant's motion for a new trial be filed herein. The matter of a new trial was then taken up, argued and presented to the court and the court overruled said motion for a new trial. To which ruling counsel for defense excepts, making the motion, ruling and affidavits contained in and filed with said motion the basis for a formal bill of exception to be later prepared and tendered the court for its signature." The defendant was then sentenced in accordance with the verdict of the jury, and his motion for an appeal to this Court was granted.

The bill of exception is extremely brief. It sets forth defendant's conviction, his application for a new trial before sentence, the ruling of the court thereon, and makes part of the bill the motion and attached affidavits as fully as if they were re-written in the bill.

The reasons influencing the trial judge to deny the motion for a new trial are set forth in his per curiam which speaks for itself. We quote from the per curiam:

"This Bill of Exception (Bill of Exception No. 2) was reserved to the overruling by the Court of defendant's motion

for a new trial. The basis for the motion was that since the trial of the case and the verdict of the Jury, the defendant had discovered new and vital evidence which was material and admissible, and would, in defendant's opinion, result in acquittal of the defendant at the hands of a Jury. The defendant sets forth that it was only since the trial of the case that he learned of the witnesses, and the evidence which they could and would give, and that he has been guilty of no laches in the premises, nor could he, by the exercise of any diligence have discovered these witnesses and this testimony before or during the trial of the case. It is further set forth that the evidence of these witnesses is not merely cumulative, and does not merely corroborate nor impeach the testimony of any other witnesses examined on the trial. There is annexed to the motion for a new trial the affidavits of the witnesses, J. L. Strahan and J. P. Mitchell, disclosing the facts that these witnesses allegedly know, and will testify to. The facts set forth in the affidavits are, substantially as follows: That on the morning of Labor Day, at about 5:30 A.M., these two witnesses were walking down Harper Street waiting for a ride back to Mobile, Alabama, where they were working, and that when they arrived at, or near the intersection of Harper and Fifth A Streets, they met a negro girl who asked them if they wanted to have a date with her, and they told her, 'no;' that soon thereafter they saw a car coming and this same negro girl walked out into the street and the car that was approaching stopped, and the defendant, Collie Saba got out and began talking with the negro girl, and

that soon thereafter the negro girl got into the car without any assistance on the part of the defendant, and the defendant got in the car behind her, and they heard the door slam and the girl hollowed as though her foot, or hand, had been caught in the door of the car; that the door was then pulled to and the car slowly drove off and they did not hear another sound from anyone in the car, nor did they see the car anymore.

"Before commenting on any of the facts alleged in these affidavits, I want to point out that at the time of the hearing of the motion for a new trial, I noticed the affidavits were made in Washington County, State of Alabama. I knew that defendant's brother, Abraham Saba, who took a very active interest in the defense of this case, worked in Mobile, Alabama, and Mobile, Alabama, is in Washington County. I further knew that Abraham Saba was a foreman in a Defense Plant, and had several men working under him. So, consequently, when I read the affidavits, knowing these facts, I asked the question if these men who signed the affidavits worked for Abraham Saba. One of the defendant's relatives, who was in Court at the time, said that these witnesses did not work for Abraham Saba, but that they worked with him. The crime was allegedly committed on Monday, September 7th, 1942, and the trial of the case was not had until Friday, November 13th, 1942, or a period of more than two (2) months after the crime was alleged to have been committed. Consequently, knowing the interest which Abraham Saba had in his brother, and the fact that these men worked with him for

a period of more than two (2) months after the crime was alleged to have been committed, it seemed unreasonable to me that Abraham Saba would not have ascertained what these witnesses knew prior to the time of the trial, had he used reasonable diligence to discover the existence of the testimony. It is even more strange that he obtained the facts set forth in the affidavits between November 13th, the date of the trial, and November 20th, the date of the application for a new trial. I am, of course, assuming that Abraham Saba obtained these affidavits for the reason that during said period of time his brother, the defendant, was in jail, and Abraham Saba worked in Mobile, Alabama, with the two witnesses who made the affidavits. The affidavits set forth that the two witnesses met this negro girl, who subsequently got into the car with the defendant, and that the said negro girl asked them if they did not want to have a date with her and that they told her, 'No.' This negro girl, who was the complaining witness, impressed me as being anything but forward. I considered it highly unlikely that a negro woman would accost two white men on a public street in Bogalusa, and particularly is this true as to the complaining witness, whom I considered to be a very reticent and shy person. I further note that the affidavit set forth that the negro girl got into the defendant's car without any assistance on his part, and that he got into the car behind her, and when the door of the car slammed the girl hollered as though her foot, or hand, had been caught in the door of the car, and that the door was then pulled to and the car slowly drove off. The negro girl testified at the time of the trial that when the defendant and the three (3) codefendants accosted her they told her they were 'the law' and to get in the car, and that when she refused the defendant seized her and attempted to throw her into the back seat; that due to the fact the car was a tudor sedan, it was impossible for the defendant to throw her all the way into the car and her legs partially stuck out over the running board, and the defendant slammed the door on them. She further testified that when the defendant told her 'they were the law' that she hollowed out to her mother, 'the law had her.' The mother testified that as soon as she heard her daughter scream out, 'the law had her,' and the car drove hastily away, she got in touch with Police Headquarters and found out her daughter had not been arrested. The Police Officers went to the scene where the girl had been picked up in the car, and their testimony relative to the examination of the gravel street and the pavement immediately adjacent thereto, showed from the skid marks of the automobile that it had left the scene at a high rate of speed. All of this testimony caused me to seriously doubt the facts alleged in the affidavits.

"I further note that in connection with the motion for a new trial the defendant alleges that the verdict returned is contrary to the law and the evidence. I do not consider it necessary to comment on this phase of the motion for a new trial for the reason I am of the opinion that the verdict of the Jury in this case was proper."

■ The burden is on the person convicted of the crime charged to rebut the presumption that the verdict of the jury was correct and that there has not been a lack of due diligence, and to establish other facts essential to warrant the granting of a new trial on the ground of newly discovered evidence. In order to meet the prerequisite of due diligence, defendant, in his motion for a new trial, merely sets forth in general terms the essentials prescribed for that purpose by Article 511 of the Code of Criminal Procedure. The article reads in part: "To entitle the accused to a new trial on the ground of newly discovered evidence, it must *affirmatively* appear that notwithstanding the exercise of reasonable diligence, the evidence was not known before or during the trial, but has been discovered since; * * *." (Writer's italics).

The pertinent allegation in the motion for a new trial is in these words: "Your mover shows that it was only since the trial of this case that he learned of the witnesses above named (J. L. Strahan and J. P. Mitchell) and of the evidence which they could and would give and that he has been guilty of no laches in the premises nor could he by the exercise of any diligence have discovered these witnesses and this testimony before or during the trial of the case."

It will be noted that defendant's motion for a new trial does not give the date or specify the exact time when the alleged newly discovered evidence came to his knowledge or from whom, where and how he received the information regarding the alleged newly discovered witnesses, and the character of the testimony they proposed to give in the event he was successful in obtaining a new trial. The particular circumstances of the discovery of the alleged new witnesses and additional evidence is nowhere set out in defendant's motion.

■ The law is clear with reference to a motion for a new trial that the proposed evidence must not only be newly discovered, but it must be shown that it could not have been discovered by the use of reasonable diligence before the verdict. State v. Raney, 181 La. 638, 160 So. 124; State v. Gray, 192 La. 1081, 190 So. 224.

■ In order to comply with the statutory requirement of due diligence with respect to alleged newly discovered evidence, it is not sufficient to merely incorporate the words of the statute in the motion for a new trial. There is something else required than the mere statement that the accused did not know of the existence of this alleged newly discovered testimony in time to have it brought forward. It must affirmatively appear that he could not have ascertained it by reasonable diligence. State v. Williams, 38 La.Ann. 361; State v. Johnson, 170 La. 1050, 129 So. 633.

■ The particular circumstances of the discovery of the evidence must be affirmatively shown in order that the court may be in a position to determine the question of diligence from the facts set forth in the motion and affidavit of the mover. Defendant's motion for a new trial is wholly lacking in that respect.

The crime for which Saba was tried and convicted was committed on September 7, 1942; the indictment was returned on October 6, 1942; and the case was called for trial on November 13, 1942. Therefore, a period of more than two months elapsed between the commission of the crime and trial of Saba. It is certain that a crime of the character of the one committed by Saba received wide publicity and was the subject of general discussion in a community as small as Bogalusa. According to the affidavits submitted in support of the motion for a new trial, Strahan and Mitchell, who worked in a defense plant in the City of Mobile, were residents of Bogalusa which they visited at weekly intervals. Abraham Saba, the brother of Collie Saba, was a foreman in the plant in which the affiants worked. It is incredible that the affiants should have retained, locked in their bosoms for over two months, information which, if true, would have materially assisted in the defense of Collie Saba, the brother of Abraham Saba, with whom they worked. The affiants assigned no reasons in their affidavits why they failed to divulge the important secret held by them until the day before the defendant was to be sentenced. The trial judge points this out in his per curiam, from which we again quote:

"The crime was allegedly committed on Monday, September 7th, 1942, and the trial of the case was not had until Friday, November 13th, 1942, or a period of more than two (2) months after the crime was alleged to have been committed. Consequently, knowing the interest which Abraham Saba had in his brother, and the fact that these men (the affiants) worked with him for a period of more than two (2) months after the crime was alleged to have been committed, it seemed unreasonable to me that Abraham Saba would not have ascertained what these witnesses knew prior to the time of the trial, had he used reasonable diligence to discover the existence of the testimony. It is even more strange that he obtained the facts set forth in the affidavits between November 13th, the date of the trial, and November 20th, the date of the application for a new trial. I am, of course, assuming that Abraham Saba obtained these affidavits for the reason that during said period of time his brother, the defendant, was in jail, and Abraham Saba worked in Mobile, Alabama, with the two witnesses who made the affidavits."

Both Strahan and Mitchell state in their affidavits that, when the automobile stopped a man got out whom they recognized to be Collie Saba. Mitchell goes so far as to state that he and Strahan were about twenty-five feet away from the car when it stopped. If the affiants were able to recognize Saba, there is no reason why Saba could not have recognized them. If that were so, and the affidavits do not show that it was not so, by no stretch of the imagination can their statements be considered as newly discovered evidence.

In his per curiam, the trial judge sets forth substantially the contents of the affidavits made by Strahan and Mitchell. The venue of the affidavits, as shown by their captions and attached jurats, was in

Washington County, Alabama. A reference to any large scale map of the State of Alabama will show that Washington County lies north of and adjacent to Mobile County in which the City of Mobile, where the affiants and Abraham Saba worked, is situated.

It was suggested in the discussion of this case by the members of the Court that it can not be doubted that if the facts sworn to by Strahan and Mitchell in their affidavits are the true facts of the case, the defendant, Collie Saba, did not commit the crime for which he was convicted. This suggestion was met by the counter-suggestion that it can not be doubted that if the facts sworn to in open court by the witnesses for the prosecution on the trial of the case are the true facts, the defendant, Collie Saba, did commit the crime for which he was indicted, tried and convicted.

In weighing the probable truth of the statements contained in the affidavits of the proposed new witnesses as against the probable truth of the sworn testimony given by the witnesses for the prosecution, the temptation of the defendant, his relatives and his friends to obtain a rehearing after the adverse verdict and the facility with which affidavits for that purpose can be obtained, must be kept in mind. The affidavits signed by Strahan and Mitchell exhibit all the internal evidence of having been prepared and presented to them for their signatures by the same person and to meet the occasion. They were signed and sworn to in the State of Alabama, beyond the jurisdiction of the district court for the Parish of Washington, in the State of Louisiana. The testimony of the witnesses for the State, which it is sought to contradict by the statements contained in the affidavits, was given in open court in the presence of the jury and the judge, subject to the cross-examination of the able counsel who represented the defendant and the denial of Saba himself who, as shown by the minutes, took the stand as a witness in his own behalf.

It is fundamental that applications for new trials in criminal cases on the ground of newly discovered evidence are not favored. They should not be lightly granted. It has been frequently pointed out in the decisions of this Court that such applications must be received with great caution, the inducement to false swearing being great. It has also been frequently pointed out in the decisions that the granting or refusing of a motion for a new trial rests within the discretion of the trial judge. A dispute as to the weight to be attached to the statements which are contained in affidavits filed in support of the motion must be determined primarily with a view to this discretion.

The discretion vested in the trial judge in passing on a motion for a new trial based on the ground of newly discovered evidence in a criminal case is to be exercised in determining the diligence shown, the truth of the matters stated, and the materiality and probability of their effect, if they are believed to be true. The presumption is that the trial judge in ruling upon the motion for a new trial properly exercised his discretion and his ruling denying the motion will

not be disturbed by the appellate court unless the discretion is arbitrarily abused.

 The rule has been firmly established by numerous decisions of this Court in criminal cases that on the hearing of a motion for a new trial based on newly discovered evidence, the trial judge is justified in disbelieving the testimony of the alleged newly discovered witnesses, where such testimony is suspicious and incredible, and in refusing a new trial on that ground. When this clearly appears from the record, this Court will not interfere with the ruling.

Thus, in State v. Barton, 178 La. 859, 152 So. 546, 549, it was held that where the application for a new trial is made upon the ground of newly discovered evidence, the denial of the motion will not be interfered with, even though the judge bases his ruling on his refusal to believe the affidavit of the alleged newly discovered witness, unless it clearly appears that the judge exercised his discretion in an arbitrary or unjust manner. The Court quoted from State v. Williams, 38 La.Ann. 361, one of the cases cited in the opinion as follows: "The greatest reliance is placed on the trial judges in refusing new trials in criminal causes, and it would be an unwise restriction to hold that they shall not take into account their belief that false-swearing has been resorted to in order to break a conviction and obtain a new trial."

In State v. Hill, 135 La. 625, 65 So. 763, where the convicted defendant's motion for a new trial on the ground of newly discovered evidence was supported

by the affidavits of three alleged newly discovered witnesses, this Court, upholding the refusal of the motion for a new trial, held that the trial judge may, in his discretion, take into account his belief that false swearing has been resorted to by a convicted defendant in an effort to set aside the verdict and obtain a new trial.

In State v. Gardner, 157 La. 116, 102 So. 89, this Court declared that the trial judge was justified in disbelieving the testimony of the alleged newly discovered witnesses where such testimony was suspicious and incredible.

In the present case, the testimony it is claimed the alleged newly discovered witnesses would give on a new trial of the case is both suspicious and incredible and the judge, in refusing the motion for a new trial, did not abuse the discretion vested in him by law.

In his motion the defendant, Collie Saba, alleges that Strahan and Mitchell, the proposed witnesses, are residents of the City of Bogalusa, where the crime was committed, and that they are white men with good reputations. The fact that the proposed witnesses are white men adds nothing to the strength of defendant's motion. It is the truthfulness of the proposed witnesses and not their color that should concern the Court. The defendant announced his conclusion that the proposed witnesses bear good reputations, but he does not set forth the particulars on which he bases his conclusion. He also announces that the proposed witnesses are residents of Bogalusa, but he does not show where or with whom they reside in

that City. The motion is barren of any recital of facts by which the reputations or the residences of the proposed witnesses may be determined by the Court.

An examination of the affidavits shows that while they vary slightly in language, they are strikingly similar in substance. Neither affiant gives any satisfactory information concerning himself. Both state that they are working in Mobile, but they do not state for whom they are working, or the nature of their work. They do not show when they acquired knowledge of the prosecution or conviction of Saba, nor from whom they obtained the knowledge. They do not show when and to whom they gave the information set forth in the affidavits, nor do they set forth the name of the party or parties who procured the affidavits from them.

Both affiants state that they were walking down Harper Street in Bogalusa, at about 5:30 o'clock in the morning, on Labor Day, which was September 7th, when they were accosted by a negro girl who asked them for a date which they refused. They state that thereafter they saw a car coming along and that the negro girl walked out into the street and the car stopped; that they recognized Saba who got out of the car and started talking to the girl, and that she then voluntarily entered the car with Saba, that they heard the door slam and the girl holler "as though she had her foot or hand caught in the door;" that the door was then pulled shut and the car slowly drove off, and that they did not see them any more.

The similarity of the statements is highly significant. The statement in Strahan's affidavit reads as follows: "He, Collie Saba, started talking with the negro girl and soon afterwards the negro girl got in the car without any assistance on the part of Collie Saba, and then Collie Saba got in the car behind her and we heard the door slam and the girl hollered as though she had her foot or hand caught in the door of the car, and the door was then pulled to and the car slowly drove off and we didn't hear any other sound from anyone in the car. We did not see them any more."

The statement in Mitchell's affidavit reads as follows: "In just a few seconds we saw a car coming and she was out in the street, and the car stopped about 25 feet from us, and a man got out of this car and we knew it was Collie Saba, and he had a conversation with the same negro girl that asked us for a date and she got in the car with said Saba and as they got in the car the door slammed and she hollered as though her foot or hand had been caught and hurt, and then the door was closed and there was no further or other sound. The car drove slowly away and we saw them all in the car. Collie Saba did not assist the girl into the car, nor was he holding her when they drove by us. We didn't see them any more and went on our way to catch our ride back to our work in Mobile."

Both affiants swore that the door of the car was slammed and that "she (the negro girl) hollered as though her foot or hand had been caught or hurt," and then the door was closed and the car drove slowly off.

How affiants were able to agree with such unanimity that the girl hollered "as though her foot or hand had been caught in the door" can not be explained on any other hypothesis than that they were given that information by some person or persons interested in the case. They certainly could not have indulged in the thought that the girl hollered "as though her foot or hand had been caught in the door of the car" from their own knowledge.

As a matter of fact, it is difficult to understand how Strahan could have thought that the foot and hand of the negro girl got caught in the door when it slammed. He states in his affidavit that "the negro girl got in the car without any assistance on the part of Collie Saba, and then Collie Saba got in the car behind her and we heard the door slam, etc." If the girl preceded Saba into the car and the door of the car was slammed by Saba who followed her into the vehicle, it is clear that the girl must have been in the car when the door was slammed.

If Strahan's statement is true, it would have been impossible for the foot and hand of the negro girl to get caught in the door of the car and hence there is no reason why he should have thought that such an occurrence took place. The same observation also applies to the statement of Mitchell to the effect that after Saba had a conversation with the negro girl, "she got in the car with said Saba and as they got in the car the door slammed and she hollowed, etc." If Mitchell's statement is true, it is certain that the girl did not get into the car after Saba. If she got into the car before Saba, or they both got into

the car together, as the statement of that witness seems to imply, it is difficult to understand how the foot and hand of the negro girl got caught in the door of the car. Hence, there was no more reason for Mitchell than there was for Strahan to think that such an occurrence took place. Nevertheless, such an occurrence did take place because, as was testified to by the negro girl, when she refused to get into the car, Collie Saba seized her and attempted to throw her into the back seat; that due to the fact that the car was a tudor sedan, it was impossible for Saba to throw her all the way into the car and her legs partially stuck out over the running board and the defendant slammed the door on them.

Both affiants state that the car drove slowly off, while the evidence of the police officers given on the trial of the case, and the physical facts prove, that the car drove rapidly off. It must be remembered that the negro girl was seized by Saba and his three companions in front of her own home, where she resided with her parents. When she was seized and thrown into the car, she cried out to her mother, who was in their home, that the "law had her," as she was told by her assailants.

Again referring to the affidavits of the proposed new witnesses, it will be noted that Strahan stated he was working in Mobile. He did not state that he was a resident of Bogalusa, nor how he happened to be in that City on September 7th, the day the crime was committed. Mitchell says in his affidavit they were in Bogalusa, "our home, on a visit, and we were on our

way back to Mobile on our job." But he does not give the location of their alleged homes, nor with whom he or Strahan lived in those homes.

It will be further noted that Strahan states in his affidavit that the reason he and Mitchell were walking down Harper Street in Bogalusa "was that the man that was supposed to look us up hadn't arrived and I had a friend down the way, who (we) were going to try to get to bring us to Mobile." But he does not mention the name of the man who was supposed to pick up Mitchell and him, nor does he mention the name or the location of the "friend down the way" whom they were "going to try to get to bring them to Mobile." The affidavit of Mitchell is likewise barren of any information on these matters. While he states that after he had witnessed the episode of the negro girl and Saba, he and Strahan went on their way to catch a ride back to Mobile, he does not say where they went to catch the ride, nor does he give the name of the person who was to furnish the transportation.

The story set forth in the affidavits of the proposed new witnesses is both suspicious and incredible. It is too fantastic to induce the belief that the principal witnesses for the State had deliberately perjured themselves in testifying against the defendant Saba on the trial of the case.

██ The trial judge, as shown by his per curiam, satisfied himself that the statements set forth in the motion for a new trial and in the attached affidavits were untrustworthy and suspicious. The trial judge, who is characterized in the brief of counsel for defendant as "an able and honest jurist," had the opportunity of following this case from its inception, to and including his refusing defendant a new trial. He saw and heard the witnesses, including defendant himself, and was familiar with all the surrounding circumstances. The trial judge was in a position to know of many circumstances, which of necessity do not appear in the record but which may have an important bearing upon the question of whether in the interest of justice to the defendant, on the one hand, or in the interest of a proper administration of the law, on the other, a new trial based on newly discovered evidence should or should not be granted. As to these circumstances this Court is not in a position to have information. After fully considering the allegations of defendant's application for a new trial and the statements contained in its supporting affidavits, the trial judge reached and announced his conclusion that defendant was guilty of the crime with which he was charged. We quote the following language from the per curiam of the trial judge: "I further note that *in connection with the motion for a new trial* the defendant alleges that the verdict returned is contrary to the law and the evidence. I do not consider it necessary to comment on this phase of the motion for a new trial for the reason that I am of the opinion that the verdict of the Jury in this case was proper." (Writer's italics.)

No injustice has been done the defendant in this case. He was prosecuted by a fair district attorney and convicted by an honest jury after a trial presided over by an impartial judge. Not one bill of ex-

ception was reserved to any act or remark of the district attorney during the course of the trial, to the conduct of the jury, or to any ruling of the trial judge. Defendant's only complaints are directed at the refusal of the trial judge to grant his motions for a continuance and for a new trial. The reasons for his refusal of the motions are fully and convincingly set forth by the trial judge in his per curiam attached to the bills.

We therefore can not hold that the trial judge erred in overruling defendant's motion for a new trial.

For the reasons assigned, the conviction and sentence appealed from are affirmed.

O'NIELL, Chief Justice (dissenting).

My opinion is that this case should be remanded to the district court for a further hearing of the motion for a new trial, in order to determine whether the judge's suspicion that the alleged newly discovered witnesses, J. L. Strahan and J. P. Mitchell, committed perjury, and that Abraham Saba committed the crime of subornation of perjury, for the purpose of thwarting the administering of justice, is well founded. To me that accusation is more important than the accusation that Collie Saba committed the crime of kidnapping.

When a motion for a new trial on the ground of newly discovered evidence is founded upon allegations or affidavits of facts which might be conceded to be true without denying the correctness of the verdict—or which are so unimportant that the alleged newly discovered evidence would not necessarily influence the verdict if the jury should hear the evidence—the judge may overrule the motion for a new trial without hearing the alleged newly discovered witnesses, and without further investigation. In that respect the trial judge has a wide scope of discretion. But, when the alleged newly discovered evidence is presented in the form of affidavits of the alleged newly discovered witnesses, who are reputable citizens of the parish—and when the facts sworn to are such that if they are true the defendant cannot possibly be guilty of the crime of which he stands convicted—the judge should not overrule the motion for a new trial on his mere suspicion that the affidavits consist of deliberate perjury, procured for the purpose of defeating the ends of justice.

The evidence on which the defendant was convicted—especially the testimony of the prosecuting witness and that of Delmer Kennedy, who turned State's evidence—was that Collie Saba, in company with three other defendants, in the automobile of one of them, met the prosecuting witness, who is a colored woman named Mary Brister, walking along Harper Street, in the City of Bogalusa, about 5:30 o'clock in the morning, on Labor Day, September 7, 1942, and that Saba got out of the car and forcibly took hold of the woman and shoved her into the car and immediately drove away, to a place two miles beyond the city limits, where the four men assaulted the woman. The sworn statements made by Strahan and Mitchell, annexed to the motion for a new trial, are direct contradictions of the evidence on which the defendant was convict-

ed. I quote now in full the sworn statement of J. L. Strahan, as follows:

"My name is J. L. Strahan. I know Collie Saba and have known him for 10 or 15 years. On the morning of Labor Day, about 5:15 or 5:30 a.m., J. P. Mitchell and I were walking down Harper Street waiting for our ride back to Mobile, Alabama, where we were working, and when we arrived at or near the street intersection of Harper or 1st. Street and 5th A. Streets we met a negro girl who asked us if we wanted to have a date with her. I told her no. Soon thereafter we saw a car coming and this same negro girl walked out into the street and the car that was approaching stopped and the girl stopped. A man got out of the car and we immediately recognized the man to be Collie Saba. He, Collie Saba, started talking with the negro girl and soon afterwards the negro girl got in the car without any assistance on the part of Collie Saba, and then Collie Saba got in the car behind her and we heard the door slam and the girl hollowed as though she had her foot or hand caught in the door of the car, and the door was then pulled to and the car slowly drove off, and we didn't hear another sound from anyone in the car. We didn't see them any more. The reason J. P. Mitchell and I were walking down this street was that the man that was supposed to pick us up hadn't arrived and I had a friend down the way who [whom we] were going to try to get to bring us to Mobile."

I quote in full now the statement made by J. P. Mitchell under oath and attached to the motion for a new trial, as follows:

"My name is J. P. Mitchell and I know Collie Saba and have known him about 17 years. On Labor Day morning of 1942, about 5:30 a.m., one J. L. Strahan and I were in Bogalusa, La., our home, on a visit, and were on our way back to Mobile to our job. We were waiting for the man to pick us up in his automobile and he hadn't arrived, and [we] were walking down Harper, or 1st Street, and just as we were approaching 5th A Street we met a negro girl who approached us about us having a date with her and we told her no. In just a few seconds we saw a car coming, and she was out in the street, and the car stopped about 25 feet from us, and a man got out of this car and we knew it was Collie Saba, and he had a conversation with the same negro girl that asked us for a date, and she got in the car with said Saba, and as they got in the car the door slammed and she hollowed as though her foot or hand had been caught and hurt, and then the door was closed and there was no further or other sound. The car drove slowly away and we saw them all in the car. Collie Saba did not assist the girl into the car, nor was he holding her when they drove by us. We didn't see them any more and went on our way to catch our ride, or a ride, back to our work in Mobile."

In the motion for a new trial Collie Saba averred, under oath, that he did not know that Strahan and Mitchell were witnesses to the occurrence, for which he was convicted of kidnapping, until sometime after the verdict was rendered, and that he was not guilty of any neglect or laches in failing to discover these witnesses before or

during the trial; that the witnesses were residents of the City of Bogalusa, in which the crime is alleged to have been committed, and would be available as witnesses if a new trial should be granted. The motion for a new trial was sworn to by Collie Saba before one of his attorneys, as notary public, and contains all of the allegations required by law to sustain a motion for a new trial.

The only alternative to the remanding of this case for the purpose stated would be to accept the affidavits of Strahan and Mitchell at their face value and grant Collie Saba a new trial. I say this because it is conceded—and could not possibly be denied—that if the affidavits of Strahan and Mitchell are true Collie Saba is not guilty of the crime of kidnapping. On the other hand, if the affidavits of Strahan and Mitchell are false, and if, as the judge suspects, the affidavits were obtained by Abraham Saba for the purpose of tampering with the administration of justice, Strahan and Mitchell and Abraham Saba ought to be prosecuted for their crime.

It is possible that the affirming of the verdict and sentence in this case, on the assumption that the judge's suspicion of perjury and subornation of perjury is well founded, will result in an investigation by some agency of the Government; and it is possible that such an investigation will result in the exoneration of Strahan and Mitchell and Abraham Saba, if in fact they are not guilty of the crime of which the judge suspects them; but the exoneration of Strahan and Mitchell and of Abraham Saba would come too late to prevent the injustice to Collie Saba, if in fact Strahan and Mitchell are not perjurers, and if Abraham Saba did not commit the crime of subornation of perjury. For that reason the only proper time and method for making an investigation of the judge's suspicion is now by remanding this case for a further hearing on the motion for a new trial. Personally, I would consider it a dereliction of judicial duty if I should close my eyes to the charge which the trial judge has made against Strahan and Mitchell and Abraham Saba in this case.

We must bear in mind that the only ground on which the judge refused to grant a new trial in this case was that he believed that the affidavits of Strahan and Mitchell constituted perjury, and that they were procured by Abraham Saba to defeat the ends of justice. The judge did not believe, nor is it possible for anyone to believe, that Collie Saba or Abraham Saba knew that Strahan and Mitchell were eye-witnesses to the affair for which Collie Saba stands convicted of kidnapping, and that Collie Saba and Abraham Saba merely neglected to have Strahan and Mitchell summoned as witnesses for the trial of the case.

The judge's accusation that Strahan and Mitchell committed perjury and that Abraham Saba committed subornation of perjury would be a grave charge at any time, against any citizen; but the charge is even more serious when it is directed, as in this case, against men who are employed in a defense plant—and particularly against one who holds the responsible position of foreman in the defense plant—in this criti-

cal time in our history. On that subject the judge made this statement in his per curiam, in support of his suspicion:

"I further knew that Abraham Saba was a foreman in a Defense Plant, and had several men working under him. * * * One of the defendant's relatives, who was in Court at the time [when the motion for a new trial came up], said that these witnesses [Strahan and Mitchell] did not work for Abraham Saba, but that they worked with him. * * * I am, of course, assuming that Abraham Saba obtained these affidavits for the reason that during said period of time his brother, the defendant, was in jail, and Abraham Saba worked in Mobile, Alabama, with the two witnesses who made the affidavits."

My understanding is that no one can obtain responsible employment in a defense plant during this critical time without an investigation into his character—particularly with reference to his being trustworthy and law-abiding in connection with the safety of our governmental institutions. I assume therefore that the character of the three men whom the judge suspects of the crime of perjury and subornation of perjury, and on which suspicion the judge based his ruling in this case, was investigated—and passed muster—before these men were given employment in the defense plant. Besides, the character of Abraham Saba and of Strahan and Mitchell is presumed to be good. In the petition for a new trial it is alleged under oath that they "are white men of good reputation"; and there is nothing to the contrary in the record—unless it be that the testimony of

Strahan and Mitchell will contradict emphatically the State's evidence.

It is not unlikely that Strahan and Mitchell, notwithstanding they were employed in the same defense plant in which Abraham Saba was employed as foreman, did not discuss with him the incident which they swear they witnessed in Bogalusa on Monday morning, September 7, when they were returning from their homes there to their work in Mobile. It is said in the brief filed by the defendant, and is not denied in the brief which the State filed two days afterwards, that the defense plant in which Abraham Saba was employed as foreman is a very large affair, and that Mobile was, in September 1942, and is yet, a center of extensive defense activities, where several large shipyards are located, employing thousands of men. It is said in the judge's per curiam that when he asked one of the relatives of Collie Saba, in the court room during the hearing of the motion for a new trial, whether Strahan and Mitchell worked for Abraham Saba, the relative replied that Strahan and Mitchell did not work *for* Abraham Saba, but worked *with* him. It is said in the brief for the defendant, and is not denied in the brief for the State, that what the defendant's relative said to the judge was that Strahan and Mitchell worked *in the same plant with* Abraham Saba—which is quite consistent with the judge's per curiam.

If the sworn statements of Strahan and Mitchell are true, there was no crime committed in the incident which they witnessed in Bogalusa on the morning of Labor Day, when Collie Saba and his three companions

in the automobile met the colored woman who afterwards accused the four men of kidnapping her. Hence there was no reason why the occurrence which Strahan and Mitchell witnessed should have made a lasting impression upon them. Even if Strahan and Mitchell learned afterwards that Collie Saba and his three companions were accused of kidnapping the woman, it is quite likely that Strahan and Mitchell did not take the matter seriously—knowing that the eyewitnesses to the woman's entering Collie Saba's automobile stood four to one—without counting Strahan and Mitchell. It is likely also that Strahan and Mitchell never thought of the incident again from the time when it occurred, until they heard or read of the conviction of Collie Saba. It is sufficient to say, at this time, that Collie Saba has made the necessary affidavit—and there is no denial of it in the record—that he did not know, before he was convicted, that Strahan and Mitchell were witnesses to the occurrence for which he stands convicted of the crime of kidnapping. On the question as to when the defendant learned that Strahan and Mitchell were witnesses to the occurrence, the judge should have accepted the affidavits which the law prescribes, or he should have called for additional proof. At any rate, we are not obliged to confine ourselves to the trial judge's finding in reviewing his ruling on the motion for a new trial.

The procedure which I propose in this case could not possibly do injustice either to the State or to the defendant. On the other hand, the affirming of the judge's ruling on the motion for a new trial, without an investigation of the judge's suspicion, must necessarily do injustice, either to the State and her courts of justice, and to the United States and her defense project, or to Collie Saba and his brother, Abraham, and to J. L. Strahan and J. P. Mitchell. Strahan and Mitchell are either telling the truth or they are deliberately committing the crime of perjury to defeat the ends of justice. It is not possible for them to be mistaken in what they swear they witnessed. There is no dispute about that. If they are swearing to the truth, Collie Saba is not guilty of the crime for which he stands convicted. There is no dispute about that. On the other hand, if J. L. Strahan and J. P. Mitchell and Abraham Saba are—as the trial judge suspects—committing the crime of perjury and subornation of perjury, to obstruct the administration of justice, they are committing a crime against the proudest of our institutions, and are dangerous and unwanted elements in a defense project at this time. As Chief Justice Marshall declared in Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60, "Between these alternatives there is no middle ground."

There is plenty of authority in law for the method of procedure which I propose in this case. Here are some of the cases in which the court followed this procedure: State v. Hyland, 36 La.Ann. 87 (the second appeal being reported in the same volume, p. 709) ; State v. Armstrong, 48 La.Ann. 314, 19 So. 146; State v. Seipel, 104 La. 67, 28 So. 880; State v. Latham, 124 La. 876, 50 So. 780; State v. Farris, 146 La. 523, 83 So. 791 (the second appeal being reported in 147 La. 663, 85 So. 631) ; State

v. Wynne, 153 La. 414, 96 So. 15. See also 24 C.J.S., Criminal Law, § 1949, Partial Reversal, p. 1114, citing Harrison v. United States, 2 Cir., 7 F.2d 259; and § 1950, p. 1118, citing People v. Leonti, 262 N.Y. 256, 186 N.E. 693; which in turn cites People v. Arata, 254 N.Y. 565, 173 N.E. 868; which in turn cites People v. Shillitano, 215 N.Y. 715, 109 N.E. 500 (by Cardozo, J.).

In State v. Wynne, 153 La. 414, 96 So. 15, we first annulled the verdict and sentence and granted a new trial, on the ground that there were exceptions to the general rule that a motion for a new trial on the ground of newly discovered evidence should be overruled if the alleged newly discovered evidence would be only cumulative or corroborative of the evidence that was heard on the original trial. We held that Wynne's case was an exceptional one for the reason which we stated at the very beginning of the opinion, thus:

"The only question presented in this case is whether the rule that a new trial of a criminal case should not be allowed for the hearing of newly discovered evidence that would be cumulative or corroborative of evidence that was heard on the original trial has its exceptions. The newly discovered evidence on which the motion for a new trial was founded in this case consisted of the testimony of eight witnesses as to facts which, for the most part, *appear to be of very grave importance.*" [Italics mine.]

Justices Land and St. Paul dissented from the annulling of the verdict and sentence and the granting of a new trial to Wynne, and Justice Land handed down a dissenting opinion. The State applied for a rehearing; asking, first, that the verdict and sentence should be affirmed, and, in the alternative, that we should merely set aside the sentence and order a further hearing on the motion for a new trial. By a per curiam opinion we disposed at once of the State's application for a rehearing, by setting aside immediately our original decree (which had been rendered on January 27, 1923), and by following immediately the same method of procedure which we should follow in the present case —thus:

"The rehearing is granted. The decree rendered on the 27th day of January, 1923, annulling the verdict appealed from and remanding this case for a new trial is itself annulled, and it is now ordered that the sentence be and it is, annulled, that this case be remanded to the district court for a trial and decision of the defendant's motion for a new trial, on its merits, *and particularly to determine whether the alleged newly discovered evidence was in fact newly discovered,* and for further and final proceedings according to law." [The italics are mine.]

That procedure, in State v. Wynne, was concurred in unanimously—even by Justices Land and St. Paul, who had dissented from our original decree, and even by the author of the prevailing opinion in the present case, who subscribed to the decree rendered originally in the Wynne case.

In State v. Latham, 124 La. 876, 50 So. 780, 783, the motion for a new trial was

based upon the sworn allegation of the defendant that one of the nine jurors, Robert Killian, who voted for the conviction of the defendant, had previously expressed his opinion that the defendant was guilty of the crime charged, but denied on his voir dire examination that he had expressed any opinion as to the guilt or innocence of the defendant. The affidavits of three persons, swearing that Killian had expressed to them his opinion that the defendant was guilty, were annexed to the motion for a new trial; and the defendant added his sworn statement that he did not know until after he was convicted that Killian had expressed the opinion that he, the defendant, was guilty of the crime charged against him; but the attorney for the defendant failed to furnish, his affidavit that he did not know of Killian's expressions of opinion until after the trial. The Attorney General, in his brief in the Supreme Court, declared that the three persons to whom Killian was said to have expressed his opinion that the defendant was guilty of the crime charged, and on whose affidavits the defendant was depending for obtaining a new trial, "were present in court during the trial of the defendant and from their affidavits had evidently taken an interest in the case", and hence that it was unlikely that the defendant did not know previous to the trial the facts which these three persons stated in their affidavits. This court, Justice Nicholls, expressed the belief that the reason why the trial judge overruled the motion for a new trial was that the attorney for the defendant did not testify or make an affidavit that he did not know before the verdict was rendered that Killian had expressed his opinion that the defendant was guilty of the crime charged. This court held that the affidavit of the defendant himself, of his ignorance of Killian's incompetency as a juror, was not enough. Hence the court followed the procedure which ought to be followed in the present case—thus:

"We are inclined to think that the ruling of the district judge adverse to the granting of a new trial was predicated upon the absence of any showing *of defendant's counsel* of their want of knowledge, until after the verdict was rendered, of any fact going to show the incompetency of Killian. * * * Under the circumstances of this case, we are not disposed to reject defendant's application on account of what was likely a want of appreciation *by defendant's counsel* of the importance of his adding his testimony to that of defendant of want of knowledge *on his part,* until after verdict, of any ground for believing that Killian was incompetent as a juror. We are not willing, however, in the present condition of the case, to reverse the ruling of the district judge on the motion and to remand the case for a new trial on its merits; *but we feel impelled and justified in setting aside the ruling and remanding the case for a new trial of and full hearing upon the motion for a new trial.* [The italics are mine.]

"For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the ruling of the district judge in refusing to grant defendant a new trial and the sentence of the court be set aside, and it is now ordered, adjudged, and decreed that the

motion for a new trial be reinstated, and a hearing and trial had on said motion."

In the earliest of the cases which I have cited, State v. Hyland, 36 La.Ann. 87, the motion for a new trial was founded upon the allegation that four newly discovered witnesses, named in the motion, would swear that the defendant was not the one who committed the crime, but that another person committed it. The defendant swore to the facts stated in his motion for a new trial, but did not attach affidavits of the alleged newly discovered witnesses. When the motion came up for hearing the defendant's counsel requested the court to call the four witnesses and hear their testimony, but the judge refused to do so, on the grounds (1) that the witnesses had not been summoned by authority of the court, (2) that their names were already mentioned in the motion for a new trial, and (3) "Because the substance of their testimony was also given in said motion, and the court had thus been apprised of what their testimony would be." This court, through Justice Poche, in following the procedure which we ought to follow in the present case, said:

"If the facts disclosed in the affidavit [of the defendant] are true, the law would clearly allow a new trial to the accused. The law is so imperative on that point that this Court would in such a case be compelled to review the discretion otherwise vested in the trial judge in dealing with motions for new trial.

"But, for the purpose of such an investigation, the appellate court must be supplied with the evidence bearing on the question of fact presented by the motion."

The court then declared that the alleged newly discovered evidence might have been brought up for review either in the form of affidavits of the alleged newly discovered witnesses or in the form of their testimony taken in open court, and that, if the evidence had been brought up in the form of affidavits of the alleged newly discovered witnesses, this court would have given the affidavits the same consideration that it would have given to the testimony of the alleged newly discovered witnesses if taken in open court. The court then followed the procedure which we should follow in the present case—thus:

"The judgment appealed from is therefore reversed. It is now ordered that the case be remanded to the lower court, with instructions to the judge to hear, and to preserve the testimony of the witnesses offered in support of defendant's affidavit on his motion for a new trial, or to receive and consider the affidavits of such witnesses in the premises, as he may deem the best; said cause to be further proceeded with according to law."

When the trial judge, in Hyland's case, had heard again the motion for a new trial, he again overruled the motion and the defendant again appealed. State v. Hyland, 36 La.Ann. 709. This court found then that two of the alleged newly discovered witnesses "were no longer accessible". And the court said: "A third witness is not produced nor is his affidavit, and his absence is not accounted for." The court

concluded that the judgment overruling the motion for a new trial was correct, but found that a part of the sentence was illegal, and remanded the case for a new sentence. But the fact that the procedure which the court followed was exactly the procedure which I favor in the present case is shown by the opening paragraph of the opinion—thus:

"Manning, J. This case was remanded with instructions to the lower judge to hear and preserve the testimony of the witnesses offered by the defendant in support of his affidavit on his motion for a new trial, and to consider the same and to act thereon. The judge has obeyed those instructions, and has refused a new trial."

Also, in the second case which I have cited, State v. Armstrong, 48 La.Ann. 314, 19 So. 146, the defendant annexed *his* affidavit to his motion for a new trial, but did not annex affidavits of the alleged newly discovered witnesses. He asked for a delay of one day in which to produce either "the witnesses or their affidavits". The judge refused the request and overruled the motion on the ground that the alleged newly discovered evidence was not consistent with the defense which the defendant had relied upon, which was an alibi. The facts of that case, therefore, are not exactly the same as in the present case; but the case cited is one of the examples which show that the procedure which we should follow in the present case would not be an innovation. The court rendered the following decree in the Armstrong case:

"It is therefore ordered that the sentence of the lower court be set aside; the verdict

of the jury not disturbed; that defendant's rule for the new trial be reinstated, to afford defendant such reasonable time as the lower court shall prescribe to make the showing for the new trial he claims he can make; after that showing, the court to dispose of the application of defendant for the new trial, grant it, or sentence the accused according to law; the accused to be held in custody to abide the action of the court."

In State v. Seipel, 104 La. 67, 28 So. 880, 882, the motion for a new trial was made on the ground merely that the verdict was contrary to the law and the evidence; and in the bill of exceptions the attorneys for the defendant averred that the judge, in overruling the motion, declared that the supreme court had decided that a trial judge could not consider whether the verdict of the jury was contrary to the law and the evidence. This court said: "The bill of exceptions was signed by the trial judge, but no reasons were given for overruling the motion [for a new trial]." Because of the judge's failure to deny that he had made the declaration attributed to him by the defendant's counsel in the bill of exceptions, this court assumed that the judge had made the declaration, showing an erroneous understanding of his authority. Hence this court followed the procedure which we should follow in this case—thus:

"It is therefore ordered and decreed that the judgment and sentence pronounced against the defendant be annulled and reversed, and that the cause be remanded to the court below, with instructions to the trial judge to examine and decide the

motion for a new trial; and it is further ordered that the verdict of the jury and other proceedings in the case be left undisturbed, pending the action of the trial judge upon the motion for a new trial."

Inasmuch as the co-defendant Holloway refused to testify, Kennedy and Mary Brister were the only eyewitnesses who testified against Collie Saba. As to Mary Brister, it is stated in defendant's brief, and is not denied in the State's brief, or elsewhere, that she admitted under oath that while separated from her husband she was a woman of unchaste character and had been staying with other men and visiting resorts of questionable character.

The district judge states in his per curiam that, according to Mary Brister's testimony, she was forcibly seized at 5:30 a. m., was carried a distance of some two miles beyond the city limits of Bogalusa, participated in five separate and distinct acts of sexual intercourse, and was returned to a point about one block from her home by 7:00 o'clock a. m.; and that the attorneys for the defendants contend that that would have been a physical impossibility. Then the judge in his per curiam points out that Collie Saba corroborated Mary Brister's testimony on that subject. The judge says: "I note that the defendant testified that all of these facts happened in a period of one and one-half (1½) hours, with the exception that he denied he forced the girl to get into the automobile."

The fact that the mother of Mary Brister summoned the police when she heard Mary call out from the automobile, and saw the car drive away with Mary and the four white men, is not conclusive proof that Mary Brister was kidnapped. A motherly instinct would have prompted Mary's mother to summon the police, whether she believed that her daughter was being kidnapped or believed that she was going willingly with four white men in an automobile at that hour in the morning. Mary Brister and her mother testified that Mary cried out that "the law had her", meaning that she was under arrest. Strahan and Mitchell swear that Mary Brister cried out as if her leg or arm was caught in the door of the car when Collie Saba closed it as she was getting in. That part of the affidavit of Strahan and Mitchell is in harmony with the testimony given by Mary Brister herself, because the judge quotes her in his per curiam, as saying "that due to the fact the car was a tudor sedan, it was impossible for the defendant to throw her all the way into the car and her legs partially stuck out over the running board, and the defendant slammed the door on them."

It is said in the prevailing opinion in this case that the affidavits of Strahan and Mitchell were made in Washington County, Alabama. That is a matter which ought to be investigated, to ascertain whether Strahan and Mitchell are subject to prosecution in the district court in which this prosecution was pending when they made and tendered their affidavits. If Abraham Saba procured the affidavits, and if they are false, he is subject to prosecution in the parish in which he brought the affi-

davits to be introduced in the court in which this prosecution was pending. Aside from this, all three of the particeps criminis were in contempt of the district court in which this prosecution was had, if they committed perjury and subornation of perjury for the purpose of obstructing the administration of justice. These are matters which should be investigated by the procedure which we should follow in this case.

It is admitted in the brief signed by the Attorney General and the District Attorney that Strahan and Mitchell reside in Bogalusa, thus: "The two affiants, Strahan and Mitchell, both live in Bogalusa but worked in Mobile *with Abraham Saba,* who was foreman in an industrial plant." The judge admits that this so-called "industrial plant" was a defense plant.

This case was first argued and submitted to this court on March 12—more than three months ago—when only five members of the court were present. The next decision day was Monday, April 12. If a majority of us could have agreed to dispose of the case then—as we should dispose of it now —by remanding the case to the district court for a further and thorough hearing of the motion for a new trial, the case would have been disposed of finally by this time, and either Collie Saba would be serving his sentence in the penitentiary and Strahan and Mitchell and Abraham Saba would be out of the defense plant and on their way to their just penalty for tampering with the administration of justice, or all of them would stand exonerated now.