137 So.2d 342

**STATE of Louisiana,**

v.

**Mervin BELL.**

No. 45554.

June 29, 1961.
On Rehearing Jan. 15, 1962.

Rehearing Denied Feb. 19, 1962.

John A. Shea, New Orleans, for appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Richard A. Dowling, Dist. Atty., Leonard Dreyfus, J. David McNeill, Asst. Dist. Attys., New Orleans, for appellee.

HAMLIN, Justice.

Mervin Bell, Clarence Lipscomb, and Irvin Johnson were charged with a violation of LSA–R.S. 14:64 (Armed Robbery). A nolle prosequi was entered in the case as to the defendants Lipscomb and Johnson.

Bell was tried by a jury and found guilty as charged; he was sentenced to serve eighteen years in the State Penitentiary at hard labor. From his conviction and sentence, he prosecutes this appeal, presenting for our consideration one bill of exceptions.

The facts in this matter are in substance as follows:

On October 13, 1960, Roland Ledet, a collector for an installment furniture store, was making his collections in the St. Bernard Housing Project; he emerged from a second floor apartment to a stair landing, where he was accosted by two young men who threatened him with straight razors and demanded his money. After being wounded, he submitted to a robbery of $629 in cash and a small radio. The men forced him to remove his trousers; they then ran from the building.

Edwina Starks, a young woman who lived in a unit wherein the robbery took place, saw two men run out of the hallway shortly after the robbery; she identified them as Mervin Bell (the defendant) and Nathaniel Brown. Ledet was brought to Charity Hospital for treatment; three hours later, he was confronted with Bell, Lipscomb and Johnson, who had previously been arrested. Ledet identified Bell as the assailant who had cut him with a razor; neither of the other two were identified. Bell remained in jail until the time of his trial.

Subsequent to defendant's conviction, but before sentence was imposed, one Harold Brown was arrested; Brown freely confessed to his participation in the instant robbery and stated that a person named Charles Johnson was the other robber. Defendant's counsel filed a motion for a new trial, alleging:

"That on the second day of December, 1960, one Harold Brown, * * * in the third district station, executed a written confession implicating himself and another * * * male by the name of Charles Johnson. In his statement the said Harold Brown goes into exact detail about the events leading up to and directly connected with the offense for which the said defendant herein was convicted. In his statement the said Harold Brown makes no mention whatsoever of Mervin Bell, defendant herein, and thereby completely exonerates the said Mervin Bell from all implication and connection with the crime for which he was convicted."

By affidavit, counsel further affirmed that the information in the motion was a matter

of public record and readily available to the Court; he stated that the information was not available to him at the time of the trial of the cause.

During the hearing of the motion for a new trial, Harold Brown reiterated his confession and exonerated the defendant; he testified that Charles Johnson was his associate in the robbery. Brown made a second appearance on the witness stand; on this occasion, he identified a man in the courtroom as his associate in the robbery. This man, who called himself James Davis, had been named by defense witness Irwin Johnson during the course of trial as Harold Brown's accomplice.

The trial judge denied the motion for a new trial; his reasons recite, in part:

"Brown was in fact a newly discovered witness and his statement in his confession and his first testimony was legally 'newly discovered evidence' but when he changed his testimony he then became a corroborating witness.

"This court is not deciding this issue upon the technical criterion of what is or is not 'newly discovered evidence,' but upon a question of substantial justice, namely, 'ought Brown's testimony to produce a different result if the case were retried and Brown and his testimony presented to a jury.'

"To place Brown in proper focus it should be pointed out that the only element that Brown could add that was not a part of the original trial would be Brown's credibility (or lack of credibility) as a witness. The substance of his testimony was heard by the jury that tried and convicted the defendant Bell.

"Irwin Johnson, the defense witness, professed to be an eye witness. Whether he was or was not, we have only his word for it. Brown actually is one of the robbers. There is doubt about the fact that he is an eye witness. (Whether as such eye witness he is or is not telling the truth about the identity of his associate is another question.)

\*    \*    \*    \*    \*    \*

"The court under its responsibility to determine what, in its opinion, a jury that heard Brown's testimony, in addition to all the other available witnesses, 'ought' to do, (bearing in mind Bell's indefeasible right to the benefit of the reasonable doubt) believes that the addition of Brown's testimony would not shake the confidence of any future jury in the testimony of Ledet and Edwina Stark any more than it would have shaken the confidence of the jury that so promptly convicted the defendant Bell.

"Johnson's testimony is discredited by his failure (and the failure of

Lipscomb and Bell) to tell the police that Johnson was an eye witness and saw Davis and not Bell in the robbery. There is nothing to cast the slightest suspicion either on the honesty or the accuracy of the testimony of Ledet and Edwina Stark. Our only conclusion then is that Johnson's testimony is false, and was concocted by Bell and himself in the Parish Prison in an attempt to save Bell from the penitentiary.

"Then came Brown and his first testimony in which he obviously named a mythical Charles Johnson. Here Brown destroyed Johnson's testimony and did Bell no good because this mythical Charles Johnson could have been Bell. True it could have been Davis or anyone, but the fact that Brown destroyed Johnson and did not exclude Bell, at that juncture, left Bell in a hopeless situation unless Brown changed his testimony to name Davis to corroborate and not contradict Johnson, and also affirmatively exclude Bell from the robbery. This Brown did.

"Here again, as against Ledet and Edwina Stark, who are reputable and disinterested witnesses, and who are convincing at least to a moral certainty that Bell and not Davis is the robber in question, a competent jury would have no choice other than to accept the testimony of Ledet and Edwina Stark."

Bill of Exceptions No. 1 was reserved to the trial court's denial of defendant's motion for a new trial predicated on the issue of newly discovered evidence—the evidence of Harold Brown associating a person other than Mervin Bell as his accomplice in the robbery. Counsel contends that the trial judge abused his discretion in that the existence of the confession now creates a reasonable doubt that Mervin Bell was implicated in the robbery, and it is a well known principle of criminal law that should any reasonable doubt exist it must be resolved in favor of the defendant.

The State contends that all of the evidence that was presented on the motion for a new trial was easily "acceptable" to the defendant at the trial itself, and that even had it been presented to the jury it would have made no difference in the verdict. The State argues further that the trial judge himself was as good a judge of the factual situation as a jury; this argument is based on the trial judge's statement that:

"It is also the opinion of the trial judge that the testimony of Brown 'ought' not, and it cannot reasonably be said that it would, change the result in a future jury trial. (Bearing in my mind that Appellant is entitled to the benefit of the reasonable doubt.)"

LSA–R.S. 15:509 provides:

"A new trial ought to be granted:

\*　\*　\*　\*　\*　\*

"(3) Whenever since verdict new material evidence has been discovered that could not have been discovered with reasonable diligence before or during trial; \* \* \*"

LSA–R.S. 15:511 (Newly-discovered evidence as ground for new trial; necessary showings and allegations) recites:

"To entitle the accused to a new trial on the ground of newly-discovered evidence, it must affirmatively appear that notwithstanding the exercise of reasonable diligence, the evidence was not known before or during the trial, but has been discovered since; that said evidence is not *merely* cumulative; that it does not *merely* corroborate or impeach the credibility or testimony of any witness examined on the trial; that it is so material that it ought to produce a different result than the verdict reached, and that it is admissible. These allegations must be recited in the motion and be sworn to by the accused." (Emphasis ours.)

In State v. Gray, 192 La. 1081, 190 So. 224, 225, we stated:

"Applications for new trials when based on the ground of newly discovered evidence should be received

with extreme caution. State v. Stovall, 154 La. 544, 97 So. 854; State v. Lee, 173 La. 966, 139 So. 302, 309.

"The granting or refusing of a motion for a new trial rests within the discretion of the trial judge, and his denial of the motion will not be disturbed by this court except for an abuse of the judicial discretion. State v. Barton, 178 La. 859, 152 So. 546; State v. Brandle, 187 La. 945, 175 So. 628.

"The proposed evidence must not only be newly discovered, but also not discoverable by reasonable diligence before verdict, in order to justify the granting of a new trial. State v. Raney, 181 La. 638, 160 So. 124." See, also, State v. Sterling, 205 La. 879, 18 So.2d 327.

The record herein conclusively discloses that there was no lack of diligence on the part of the defendant or his counsel in not discovering and producing Brown before trial. In his reasons for denying the motion for a new trial, the trial judge states that "Brown was in fact a newly discovered witness and his statement in his confession and his first testimony was legally 'newly discovered evidence.'" Under such circumstances, we find that the testimony and confession of Harold Brown is newly discovered evidence which is relevant and material; that said evidence

is not *merely* cumulative or *merely* corroborative and meets the test set forth in LSA–R.S. 15:511, supra. What effect Brown's testimony will have upon a jury is speculative. Nevertheless, the defendant is entitled to a new trial for the purpose of having the benefit of this newly discovered evidence and having it presented to a jury. The jury is also entitled to have the benefit of this evidence, along with the other circumstances of the case, and to weigh it all in judging the facts.

The case of State v. Dimm, 153 La. 95, 95 So. 414, is apposite to the instant prosecution. In that case, this Court held newly discovered evidence in the form of an affidavit sufficient for the granting of a new trial. This affidavit, by a young boy of nine years, was to the effect that he had seen the victim of a shooting, shortly after such event, drop a gun which was picked up by a lady. We pertinently stated:

"Sidney Teal was the deceased, and while it is true that the other evidence in the case tends to negative the idea that Teal had a pistol, or was attempting to use it, if he did have, yet, we cannot say what effect such proof might have had upon the minds of the jurors, had it been produced before them. There appears to have been no doubt but that the deceased provoked the difficulty, and actually knocked accused against the wall or fence before he fired; hence, if it had been shown that he had a pistol and was in the act of drawing it when he was shot, the jury could and doubtless would have found that he acted in self-defense. The evidence was certainly relevant and material, since admittedly there was none other to the same effect. It is not impossible that the other witness did not see fit to mention the pistol, or that they failed to see it; and, in any event, the jury was entitled to have the benefit of this evidence, along with the other circumstances of the case, and to weigh it all in judging the facts.

"It is not intimated by counsel for the state that the evidence in question was not newly discovered, or that it is false or unworthy of belief; hence it does not appear necessary to remand the case for laying that foundation.

"Our conclusion is that accused was entitled to a new trial for the purpose of having the benefit of this newly discovered evidence. State v. Frisbie, 41 La.Ann. 615, 6 So. 139."

For the foregoing reasons, it is ordered that the conviction and sentence of the trial court be set aside and reversed, and that this case be remanded for a new trial in accordance with the views herein expressed.

McCALEB, J., dissents with written reasons.

SUMMERS, J., dissents.

HAWTHORNE, J., does not participate.

McCALEB, Justice (dissenting).

I do not agree that Bell is entitled to a new trial just because the testimony and confession of Brown is newly discovered evidence, which is relevant and material and not merely cumulative or merely corroborative. It is also essential, under R.S. 15:511, that the newly discovered evidence be of such a nature " * * * that it ought to produce a different result than the verdict reached * * *". This means, of course, that the newly discovered evidence be believable and credible and, in determining this question, the trial judge, who has seen and heard the witnesses testifying at the trial and on the motion for a new trial, is vested with a sound discretion.

In State v. Saba, 203 La. 881, 14 So.2d 751, 757, it was stated:

"The rule has been firmly established by numerous decisions of this Court in criminal cases (citing State v. Williams, 38 La.Ann. 361; State v.

Hill, 135 La. 625, 65 So. 763; State v. Gardner, 157 La. 116, 102 So. 89 and State v. Barton, 178 La. 859, 152 So. 546) that on the hearing of a motion for a new trial based on newly discovered evidence, the trial judge is justified *in disbelieving the testimony* of the alleged newly discovered witnesses, *where such testimony is suspicious and incredible, and in refusing a new trial on that ground.* When this clearly appears from the record, this Court will not interfere with the ruling." (Cases cited in parenthesis and emphasis added).

It is clearly demonstrated by the trial judge in his written reasons for denying defendant's motion for a new trial, which are attached to and made part of his per curiam to the bill of exceptions, that the new witness, Harold Brown, is of doubtful veracity and, indeed, that his testimony, when analyzed with the other defense testimony and weighed against the disinterested and believable evidence produced by the State, is incredible. In these circumstances, the ruling of the majority herein that the judge has abused his discretion does not seem warranted.[1]

1. The case of State v. Dimm, 153 La. 95, 95 So. 414, relied on in the majority opinion, is plainly distinguishable on its facts from the situation obtaining here. In that matter, the Court had before it the affidavit of a nine-year-old boy who stated that he had seen the victim drop a gun shortly after the shooting and the Court ruled that this was material new evidence in support of the defendant's plea that he acted in self-defense. The credibility of the young boy's affidavit was not brought into question, the Court, remarking that, in view of this, it was not necessary to remand the case for laying that foundation.

Although lengthy, I believe it appropriate to set forth the reasons of the trial judge in this case which, in my opinion, fully justified his action in denying the motion for a new trial.

"This is a motion for a new trial on the basis of newly discovered evidence. The evidence originally, as it originally developed, and in its original form, was newly discovered within the meaning of the law, but in the process of falsifying first in one direction and then shifting to another direction in order to change over from the first falsification to a statement that would more reasonably 'fit' in the context of this case the defense may have collided with the legal definition of 'newly discovered evidence'.

"L.R.S. 15:511:

" 'Newly Discovered Evidence As Ground For New Trial—Necessary Showings And Allegations.

" 'To entitle the accused to a new trial on the ground of newly discovered evidence, it must affirmatively appear, that notwithstanding the exercise of reasonable diligence the evidence was not known before or during the trial, but has been discovered since; that said evidence is not merely cumulative; that it does not merely corroborate * * * the credibility or testimony of any witness examined on the trial; that

it is so material that it ought to produce a different result than the verdict reached and that it is admissible.'

"Subsequent to defendant's conviction of this crime of robbery, one Harold Brown, was arrested. Brown freely confessed his participation in the robbery and in his confession stated that a person whom he named as Charles Johnson was the other robber. According to Brown's confession this 'Charles Johnson' was his, Brown's associate in the robbery, which means that the defendant herein, was not the other robber.

"Brown re-iterated his confession, as a witness, on the trial of this motion for a new trial, testifying that a negro whom he knew as Charles Johnson was his associate in the robbery. At this time Brown in his confession and upon the witness stand was naming as his associate in the robbery an identity other than the defendant Bell and an identity other than one James Davis.

"On the trial of the case Irwin Johnson, a defense witness, testified that he saw the two robbers as they fled the immediate scene of the robbery; one of the robbers was Harold Brown, this Brown we are speaking of, and the other robber was a certain James Davis.

"A few days after his first appearance on the witness stand Brown made a second appearance on the witness stand and this

But, in the case at bar, the truthfulness of the statement and evidence of Harold Brown, the confessed robber who seeks to exonerate the defendant herein, has been seriously challenged and the judge has found his evidence incredible.

time he identified in the courtroom, as his associate in the robbery, this James Davis, the same James Davis that Johnson identified in his testimony on the trial of the case.

"Brown was then corroborating the testimony of Irwin Johnson given on the trial of the case. A stipulation in Art. 511, above, declares that newly discovered evidence is evidence 'that is not merely cumulative; that it does not merely corroborate the credibility or testimony of any witness upon the trial.'

"Brown was in fact a newly discovered witness and his statement in his confession and his first testimony was legally 'newly discovered evidence' but when he changed his testimony he then became a corroborating witness.

"This court is not deciding this issue upon the technical criterion of what is or what is not 'newly discovered evidence', but upon a question of substantial justice, namely, 'ought Brown's testimony to produce a different result if the case were retried and Brown and his testimony presented to a jury.'

"To place Brown in proper focus it should be pointed out that the only element that Brown could add that was not part of the original trial would be Brown's credibility (or lack of credibility) as a witness. The substance of his testimony was heard by the jury that tried and convicted the defendant Bell.

"Irwin Johnson, the defense witness, professed to be an eye witness. Whether he was or was not, we have only his word for it. Brown actually is one of the robbers. There is doubt about the fact that he is an eye witness. (Whether as such eye witness he is or is not telling the truth about the identity of his associate is another question.)

"Mervin Bell, Defendant herein.

"Clarence Lipscomb,

"Irwin Johnson,

"Three colored youths were charged in the Bill of Information with the crime of armed robbery.

"November 23, 1960, the state nolled prossed the case against Lipscomb and Johnson.

"November 30, 1960, Bell was tried by a jury and convicted.

"The facts of the crime are: On October 3, 1960, about 3:00 P.M. O'clock, two negro youths, each armed with a straight razor, confronted one Roland Ledet, a white man, on a stairway between the first and second floors of a housing unit in the St. Bernard 'project' in New Orleans. Ledet at first resisted, and in a struggle with one of his assailants that assailant dropped his razor and the other assailant cut Ledet severely across his chest. Ledet

then submitted and according to Ledet the assailant took from him $690.00 in cash, a portable radio, and made him remove his trousers. The assailants made off down the stairs and ran off, dropping the trousers.

"It so happened that as the two assailants were fleeing the immediate scene of the crime they passed within some four feet of a window through which they were seen by one Edwina Stark, a young colored woman. She knew both of the assailants and knew Bell particularly well. Edwina so informed the investigating police officers and they immediately began a search for the two robbers. Within a few hours, Bell, Irwin Johnson, and Clarence Lipscomb were found together in a theater and arrested and conveyed to the Charity Hospital where Ledet was being treated for his wound. Ledet definitely identified Bell as one of the robbers. (He did not identify Johnson or Lipscomb as the other assailant.)

"When Edwina gave the police the information it was given with the understanding that she would not be brought into the case. The day before the trial the police prevailed upon her to be a witness.

"Ledet: Ledet is 39 years of age, an ex-Marine; does not wear glasses; he is alert and vigorously healthy. The commission of the robbery and the turn of events therein gave Ledet a sustained and continuing close up view of the faces of his two assailants. He saw Bell within a few hours of the crime and identified him definitely and positively.

"Edwina Stark: This witness is a young negro woman, in her early twenties, neat in appearance and above the average in intelligence.

"Bell, Irwin Johnson, Lipscomb, Harold Brown, as well as James Davis, are a group of young negro criminals who are familiars in the St. Bernard housing project where the robbery was committed and where Edwina resides. Giving the police information and testifying as a witness for the State against such persons is a fearful prospect for anyone much more for a resident of this colored housing 'project'. Hence, Edwina's reluctance to appear as a state witness and to give damaging testimony against Bell.

"This witness knew Bell and knew him well. That she made an error in identifying Bell is remote and minute. If she is deliberately falsifying then either she is a mental case or else, in cold-bloodedly attempting to send an innocent person to the penitentiary she is diabolically vicious in her malevolence towards Bell.

"There is absolutely nothing to show that Edwina is anything but a perfectly normal healthy human being, mentally and physically. Nothing has been brought forward even to suggest any cause for a motivation that would drive her to such spectacular venom against Bell. The only reasonable

theory that can be proposed is that she is acting herein like a perfectly normal human being with the same regard for the moral law of truth and honesty that we would expect to find in any other normal human being under the same circumstances.

"While she was on the witness stand, by way of cross-examination, it was suggested to the jury that Edwina was angered at Bell because she and Bell had had a 'date' and Bell had 'stood her up'. It was her testimony that she and Bell did have a 'date' but that she 'stood Bell up' because she did not care to go out with him.

\*  \*  \*  \*  \*  \*

"The state's case consisted of the indentification of Bell by Ledet and Edwina.

"In addition to the fact that the two state witnesses are reputable and disinterested is the fact that they were completely independent. Each was the original source of his and her identification and testimony.

"Shortly after the robbery Edwina Stark informed the officers (confidentially) that Bell was one of the robbers. At that time Ledit was either in the hospital or on his way there. When the three colored youths, Johnson, Lipscomb, and Bell were brought to Ledet at the hospital, Ledet had no knowledge that Bell had been identified as one of the robbers by Edwina Stark and he too identified Bell as one of the robbers and among the three he identified no one except Bell.

"This court believes that these circumstances are convincingly corroborative of Edwina Stark's identification and Ledet's identification.

"The Case for the Defense and for the Motion for a New Trial:

"On the day of the robbery, in an apartment, in a housing unit two units removed from the unit in which the robbery occurred, Lipscomb and his common law wife and his children were spending a few days at the time. Lipscomb, his wife and Johnson testified that Bell had been in this apartment the entire night before the robbery and all the day of the robbery, leaving in the late afternoon, sometime after the time of the robbery, in a taxicab for the theatre with Lipscomb, his wife, and Johnson, where he, Bell, Lipscomb and Johnson were arrested and brought to the hospital for Ledet to view.

"Johnson testified that they were drinking beer the night before and all the day of the robbery; that on the day of the robbery, he, Johnson, left this apartment and on his return he saw the two robbers fleeing the scene of the robbery; that one of the robbers was Brown, the other was one James Davis. At the time of the trial Davis was serving a year in the parish prison for some offense; he was brought into court for the view of the jury and the witness, Johnson, and Johnson identified him as the Davis he was referring to.

"Subsequent to the trial and conviction of Bell, Harold Brown was arrested for this robbery. Brown made a free and voluntary confession in which he detailed his part in the robbery and stated that a Charles Johnson was his associate in the robbery. Brown's confession, if true as to 'Charles Johnson' excluded Bell as Brown's associate in the robbery.

"Later Brown was called as a witness on the trial of the motion for a new trial and he re-iterated his confession in toto, insisting that a certain Charles Johnson was his associate in the robbery. Then a few days later, Brown was recalled to the witness stand and Davis was produced in court for Brown's inspection. Brown identified Davis as the man he said he thought was named Charles Johnson. So that both Irwin Johnson and Brown, one of the robbers, have now testified that this certain James Davis, and not Bell, was the other robber.

"And here too we have the situation that Johnson and Brown are making no mistake of identity. If Davis is not one of the robbers Johnson and Brown are attempting to send an innocent man to the penitentiary.

"Returning to Irwin Johnson and his testimony:

"Admittedly the first time that Johnson ever told any official that he saw the robbers and that Davis was one of them was as a witness on the trial of the case.

"When asked on the trial of this motion why he did not tell the police this story his explanation was that he tried to tell the police but they would not listen to him. Just what effort he made to tell the police or what motions he went through in the attempt, he does not make clear. Neither does he say if he made one or several attempts to tell the police. This circumstance warrants scrutiny:

"According to Johnson, before he, Lipscomb and Bell left the housing project for the theater Johnson knew and we must conclude that all of them knew of this robbery because Johnson, according to his testimony, saw and recognized the two robbers fleeing the scene; then Ledet had to recover his trousers and put them on; police called; police investigation and excitement, etc. * * * etc., in and at the housing project.

"Johnson and the others did not leave the area wherein this robbery was committed until some two hours after the robbery.

"After their arrest Johnson, et als., were brought by the police to the hospital to present them to Ledet; then they were brought by the police from the hospital to a police district station; they were kept in the district station a day or so; then

brought by the police to the 'show up' room, and put through the 'show up' procedure; the 'show up' procedure includes an interrogation of each individual prisoner on the 'show up' stage by the police officer in charge of the 'show up', that is to say, questions by the police, answers by the prisoner; then Johnson was brought by the police back to the district station and kept there about a day before being delivered to the criminal sheriff in the Parish Prison.

"It is common knowledge not only that interrogating prisoners is a matter of police routine but a substantial part of crime information is derived by the police from the interrogation of arrested persons.

"If Johnson testified to the truth when he swore that Davis and not Bell was the robber, then in the arrest and at the police stage, we have a situation in which Johnson, Lipscomb and Bell (through Johnson) knew that Bell was innocent, and the then logical method of asserting and establishing Bell's innocence, and the way immediately at hand, was for Johnson to tell the police what he testified to on the witness stand. Neither Johnson, Lipscomb, nor Bell said one word to the police.

"This array of facts tends to prove, if it does not prove, that Johnson was not at the scene of the robbery and did not see the robbers fleeing the scene because if he had seen the robbers, when he was within whispering distance of the police for days at a time, coming and going with the police, he would at some time have told the police. He and Lipscomb had some stake in his information and Bell's interest therein was pressing and vital. The decision to tell or not tell the police was not Johnson's alone— there was Bell and Lipscomb to pressure him. It was not a situation in which Johnson and another had committed a crime and Johnson was called upon to inform on his partner in the crime. Johnson, according to Johnson, was merely a chance eye witness, in jail with a good friend of his who had been identified as one of the robbers, and Johnson, with the authority of an eye witness, could tell the police his friend was innocent.

"Bell had been in the penitentiary and both Johnson and Bell were quite familiar with jail and police routines. The critical time to tell the police was then. If the information was then suppressed and later told it would have all the earmarks of an afterthought.

"Johnson and Bell did not spare Brown and Davis later, in the court room, on the trial. Bell's liberty was no less at stake in the police station.

"Without belaboring the point further, Johnson's story is incredible and incredible beyond any doubt when weighed against the testimony of Ledet and Edwina Stark.

"When Edwina Stark informed the police that she knew and recognized the two robbers she told the police that one was Bell and the other 'Nicholas' Brown. The police therefore were searching for a Nicholas Brown. On November 24, 1960, Sergeant Cates, who was searching for 'Nicholas' Brown, arrested Harold Brown on some charge and Brown was later released because the police did not then suspect that he was the Brown they were seeking under the name of Nicholas Brown.

"Sometime later Sergeant Cates learned that Harold Brown's nickname was 'Gate' and the man he was seeking as the other robber had the nickname 'Gate'. Sergeant Cates then took several photographs including one of Harold Brown to the victim, Ledet, and Ledet identified Harold Brown as the second robber. A day or so later Harold Brown in a line up in the 'show up' room was presented to Ledet, and Ledet identified Harold Brown in the line up. After his identification by Ledet Brown made his confession and what followed with reference to Brown has already been stated.

"Two matters should be specially noted:

"(a) When Brown was first on the witness stand and testified that a Charles Johnson was his associate in the robbery the court interrogated Brown closely about the identity of his associate. Brown was quite positive. He stated that he knew Charles Johnson from the Scottlandville reformatory; that he understood that Charles Johnson lived in or near Baton Rouge, just where, he did not know.

"Later when he changed and attempted to appear as if he was not changing from one identity to another, he testified that he had heard Davis called by the name Charles and thought his name was Charles Johnson.

"Davis testified that he knows and knew Brown well and Brown knew him well; that he, Davis, had called himself John Davis, James Davis and Robert Williams, but never a Charles or a Johnson.

"(b) At the point when Irwin Johnson had testified that the two robbers were Brown and Davis, and Brown testified that the two robbers were himself and a Charles Johnson, Irwin Johnson was contradicting Brown, and Brown was contradicting Johnson, and Bell was the complete loser. On the trial of his case, Bell, on this point, had the testimony of Johnson, but now on the trial of his motion for a new trial, he did not even have Johnson's testimony because it was destroyed by Brown, and Brown's story was in turn destroyed by Johnson. In this situation, to use the parlance, for Bell 'to get back in the ball game', it was necessary for Brown to change his testimony from Charles Johnson to Davis. After a few days in the parish prison, Brown made this change. Brown was

brought back into court by the court itself a few days later for Brown to look at Davis and Brown then testified that Davis was his partner in the robbery.

"In these proceedings it became material to ascertain as much as could be ascertained about Davis, Brown, Bell and Irwin Johnson for the purpose of finding out if each knew the other; if there had ever been any occasion for malice against Davis, etc. All that could be learned was that they had criminal records and knew one another in crime, in reformatories, in jails, and otherwise.

"The records of the criminal court show that Bell was sentenced to three years in Angola for a burglary; that Davis and one Martin and Bell committed the burglary together; that they were arrested inside a room attempting to break through into a restaurant; that Bell was over 17 and was sent to. the penitentiary, and Davis and Martin were 15 and were charged in the Juvenile Court.

\*   \*   \*   \*   \*   \*

"The court under its responsibility to determine what, in its opinion, a jury that heard Brown's testimony, in addition to all the other available witnesses, 'ought' to do, (bearing in mind Bell's indefeasible right to the benefit of the reasonable doubt) believes that the addition of Brown's testimony would not shake the confidence of any future jury in the testimony of Ledet and Edwina Stark anymore than it would have shaken the confidence of the jury that so promptly convicted the defendant Bell.

"Johnson's testimony is discredited by his failure (and the failure of Lipscomb and Bell) to tell the police that Johnson was an eye witness and saw Davis and not Bell in the robbery. There is nothing to cast the slightest suspicion either on the honesty or the accuracy of the testimony of Ledet and Edwina Stark. Our only conclusion then is that Johnson's testimony is false, and was concocted by Bell and himself in the Parish Prison in an attempt to save Bell from the penitentiary.

"Then came Brown and his first testimony in which he obviously named a mythical Charles Johnson. Here Brown destroyed Johnson's testimony and did Bell no good because this mythical Charles Johnson could have been Bell. True it could have been Davis or anyone, but the fact that Brown destroyed Johnson and did not exclude Bell, at that juncture, left Bell in a hopeless situation unless Brown changed his testimony to name Davis to corroborate and not contradict Johnson, and also affirmatively exclude Bell from the robbery. This Brown did.

"Here again, as against Ledet and Edwina Stark, who are reputable and disinterested witnesses, and who are convincing at least to a moral certainty that Bell and not Davis is the robber in question, a

competent jury would have no choice other than to accept the testimony of Ledet and Edwina Stark.

"For these reasons, this Court denies the motion for a new trial."

## On Rehearing

McCALEB, Justice.

We granted a rehearing herein to reconsider our ruling that the trial judge abused his discretion in refusing appellant's motion for a new trial founded on newly-discovered evidence. The facts of the case, so far as pertinent to our discussion, are as follows:

Appellant, Mervin Bell, was tried and convicted of armed robbery (R.S. 14:64), having been identified as one of the two young Negro thugs who set upon one Roland Ledet, a collector for an installment furniture store, while he was making his collections from tenants in the St. Bernard Housing Project in the city of New Orleans, threatening him with straight razors and demanding money. Ledet resisted but, after being severely cut across the chest with a razor, submitted to the robbery and $690 in cash and a portable radio were taken from his person. His assailants then fled but, during their escape from the immediate scene, were seen and recognized by one of the tenants of the housing project, one Edwina Stark, who knew both of them. This young colored woman gave the police this information shortly after their arrival at the housing project. A search was conducted and, within a few hours, Bell, one Irvin Johnson and one Clarence Lipscomb were found together in a theatre. They were arrested and conveyed to Charity Hospital, where Ledet was being treated for his wounds. After inspection, Ledet recognized Bell as one of the robbers but did not identify either Johnson or Lipscomb as his other assailant.

Thereafter Bell, Lipscomb and Johnson were charged with armed robbery but only Bell was brought to trial, the case being nolle prosequied as to Lipscomb and Johnson. The other assailant, whom the eyewitness, Edwina Stark, said was one "Nicholas" Brown, had not been apprehended or charged at that time.

At the trial, appellant was positively identified by Edwina Stark and Ledet, as one of the two holdup men. Bell's defense was in the nature of an alibi. Lipscomb, his wife and Johnson were his witnesses and they testified that Bell had been in Lipscomb's apartment in the housing project the entire night before the robbery and all of the following day, leaving in the late afternoon, sometime after the commission of the crime to go to the movie theatre where the three men were arrested. Johnson further professed that he was an eye-witness to the robbery; that he left Lipscomb's apartment on the day thereof and, on his return, he saw the robbers (whom he knew) fleeing

the scene; that one was a man named Brown and that the other was one James Davis who was, at the time of trial, serving a year in the parish prison for another offense. Davis was brought into the courtroom and Johnson identified him as one of the holdup men.

After Bell's trial and conviction, but before sentence, a Harold Brown was arrested as one of the participants in the crime °and he made a voluntary confession, stating that his associate was one "Charles Johnson". Based on this confession, Bell's counsel filed a motion for a new trial alleging that this was newly discovered evidence and that, since it exonerated Bell, a new trial should be granted. At a hearing held on the motion for a new trial, Brown reiterated the statement made in his confession that he and Charles Johnson were the robbers and that Bell was not a participant. This hearing was continued and, a few days later, Brown was again placed on the stand. On that occasion, he testified that the man to whom he referred as Charles Johnson, was actually James Davis, the same individual that Irvin Johnson had identified at the trial as the man who had committed the robbery with Brown.

In his lengthy per curiam, which is attached to and made part of the dissenting opinion filed on the original hearing in this Court, the trial judge, after a painstaking consideration and analysis of all of the evidence, concluded that the motion for a new trial was not well founded (1) for the reason that the *last* evidence given by the newly-discovered witness, Brown, was merely cumulative and corroborative of the evidence given at the trial by Bell's witness, Irvin Johnson, and (2) because, even if Brown's evidence be regarded as newly-discovered, his testimony was incredible and, hence, "ought *not*" produce a different result at another trial.

■ In the majority opinion on first hearing, the Court quoted approvingly from State v. Gray, 192 La. 1081, 190 So. 224, wherein it is stated that applications for new trials based on the ground of newly discovered evidence should be received with extreme caution (State v. Stovall, 154 La. 544, 97 So. 854; State v. Lee, 173 La. 966, 139 So. 302) and that the granting or refusing of such motions rests within the discretion of the trial judge whose action will not be disturbed by this Court save in cases of clear abuse. State v. Barton, 178 La. 859, 152 So. 546; State v. Brandle, 187 La. 945, 175 So. 628. In the observance of these precepts, it has been many times held by the Court that, where the trial judge finds the newly-discovered evidence to be suspicious and of doubtful credibility, he is justified in refusing a new trial and his exercise of discretion will not be disturbed on appeal. State v. Williams, 38 La.Ann. 361; State v. Hill, 135 La. 625, 65 So.

763; State v. Glover, 140 La. 726, 73 So. 843; State v. Patterson, 150 La. 114, 90 So. 532; State v. Gardner, 157 La. 116, 102 So. 89 and State v. Saba, 203 La. 881, 14 So.2d 751.

■ It was because of the long standing jurisprudence that the drafters of our Code of Criminal Procedure of 1928 incorporated therein a special Article (No. 511) setting forth in detail the conditions which must appear in order to entitle the defendant in a criminal case to a new trial on the ground of newly-discovered evidence. After declaring that the evidence must be newly discovered and could not have been known before the jury trial, notwithstanding the exercise of reasonable diligence, Article 511 (R.S. 15:511) provides that it must affirmatively appear "that said evidence is not merely cumulative; that it does not merely corroborate or impeach the credibility or testimony of any witness examined on the trial; *that it is so material that it ought to produce a different result than the verdict reached,* and that it is admissible. These allegations must be recited in the motion and be sworn to by the accused." [1] (Emphasis ours.)

Although he concluded that the last evidence given by Brown was merely corroborative of the trial evidence of Irvin Johnson, the district judge's main reason for denying the motion for a new trial was that Brown's testimony was so suspicious and incredible that it "ought not" produce a different result at another trial.

■ A review of the facts outlined in the judge's per curiam has convinced us that he is correct on both grounds. First, we think the judge properly assumed that Brown's *last* testimony (that James Davis, whom he stated he thought was named Charles Johnson, was his associate in the robbery) would be the testimony that he would give at another trial. This evidence does not meet the requirements of R.S. 15:511 as it is merely corroborative of the testimony given at the trial by Irvin Johnson. Being merely corroborative of testimony which was heard by the trial jury, the *evidence* is not newly discovered although Brown is a newly-discovered *witness*.

■ Secondly, and *a fortiori*, after considering the judge's per curiam, in which he sets forth in detail the reasons for his disbelief of Brown's testimony exonerating Bell, we think he rightly concluded that this evidence should not cause an impartial jury

---

1. We take note in this case that the motion for a new trial does not comply with the mandate of Article 511 in that it is not alleged therein that the testimony of Harold Brown is so material that it ought to produce an acquittal of Bell at another trial and in that the motion is not sworn to by Bell himself, as required by the statute, but by his counsel. However, since the State has not objected to this procedural deficiency, we consider that it has been waived.

to doubt the veracity of the statements given by Ledet and Edwina Stark. Under the codal article and our uniform jurisprudence, the test to be employed by the district judge in considering a motion for a new trial based on newly-discovered evidence is not simply whether another jury might bring in a different verdict—this is always a speculative matter—it is whether the new evidence is "so material that it *ought* to produce a different result than the verdict reached, * * *". If the judge finds that the newly-discovered evidence is suspicious or incredible (as in this case) then he properly exercises his discretion in denying a new trial as such evidence *ought not* produce a different result in the matter.

The case of State v. Dimm, 153 La. 95, 95 So. 414, relied on in the original opinion for the result reached, is distinguishable on the ground that, there (unlike here), the credibility of the newly discovered witness was not even brought into question.

For the reasons assigned, the conviction and sentence are affirmed.

· HAMITER, J., dissents, being of the opinion that the original decree should be reinstated.

HAMLIN, J., dissents with written reasons.

HAMLIN, Justice (dissenting).

I am compelled to dissent from the majority opinion on rehearing. The last paragraph thereof sets forth that the case of State v. Dimm, 153 La. 95, 95 So. 414, relied on in the original opinion for the result reached, is distinguishable from this matter on the ground that, there (unlike here), the credibility of the newly discovered witness was not even brought into question.

I have re-examined the record in the Dimm case,[1] No. 25,373 of the Docket of this Court. It discloses that Bill of Exceptions No. 2 was reserved upon the overruling of a motion for a new trial as in the instant case. While this bill of exceptions was signed by the trial judge, he did not write a per curiam. Therefore, the record does not contain any expression by him as to *his* reasons for refusing the motion for a new trial. However, a reference to the brief filed therein by the State of Louisiana discloses the following statement:

"On the trial of the motion for a new trial it was argued on behalf of the State, and is argued now, that the mat-

---

1. I was one of the attorneys employed in the Dimm case after his conviction. As notary public I administered the oath to the newly discovered witness when he signed his affidavit attached to the motion for a new trial. I prepared the brief in the Dimm case on appeal and argued the Dimm case before this Court.

ters set up in the motion are not sufficient to set aside the verdict of manslaughter, and for two reasons: The witness saw no part of the difficulty, and hence, *even were it true* that deceased was seen with a pistol in his hand after the shooting, that part would not disclose when the pistol was drawn, it would have no tendency to show that deceased with a pistol assaulted accused before accused fired his fatal shots. If deceased had a pistol and drew that pistol after accused had shot him, then he acted in self-defense, and furnished accused no excuse for the murderous attack already made. *If it be true* that witness saw deceased with a pistol, then beyond all question, deceased did not have that pistol in his hand before he was shot. *That he did not display any weapon before being shot is established by the testimony of all the witnesses, even by the testimony of accused himself.* In the second place, the 'newly-discovered evidence' is *contradictory of defendant's testimony and of the testimony of his witnesses.*" (Emphasis mine.)

Here follows a discussion of the testimony of defendant Dimm and the testimony of two defense witnesses and two State's witnesses. In its brief the State further urges that none of these witnesses said a word about the deceased having a pistol in his possession. Then, having previously questioned the truth of the affidavit of the newly discovered witness, the State further sets forth in its brief:

"It is perfectly plain that, however honest the nine-year-old boy may be in the statement, he is mistaken; the affidavit was made months after the occurrence. The testimony shows that the only person upon the fatal night who had a pistol was Dimm. The man that the boy saw with a pistol was Dimm, and not Teal, and the man that he saw drop a pistol was Dimm, not Teal.

"The motion for a new trial was properly overruled."

Thus it will appear that in the Dimm case the State (1) *did* urge that the newly discovered evidence was cumulative and corroborative of evidence given at the trial, and (2) *did* question the truth or credibility of the affidavit of the newly discovered witness; therefore, the statement of this Court in that case, to the effect that it was not intimated by the State that the newly discovered evidence was false or unworthy of belief, is erroneous. The foregoing excerpts from the State's brief clearly show that the falsity or unworthiness of the affidavit and the credibility of the newly discovered witness *were* urged.

It is my view that there is no difference between the circumstances of the Dimm

case and the circumstances of the instant case, and that the Dimm case is applicable here.

It is true that this defendant is charged with a heinous offense; nevertheless—as Associate Justice Dawkins so soundly stated in the Dimm case—he is still entitled to have the benefit of the newly discovered evidence.

For the reasons set forth herein and in the original opinion, of which I was the author, I respectfully dissent from the majority opinion on rehearing.