711 So.2d 393 (1998)
STATE of Louisiana, Plaintiff-Appellee,
v.
Marcus HUBBARD, Defendant-Appellant.
No. 30604-KA.
Court of Appeal of Louisiana, Second Circuit.
April 8, 1998.
*394 Louisiana Appellate Project by Peggy J. Sullivan, Monroe, for Defendant-Appellant.
Richard Ieyoub, Attorney General, William R. Coenen, Jr., District Attorney, Penny Wise-Douciere, Assistant District Attorney, for Plaintiff-Appellee.
Before NORRIS, STEWART and CARAWAY, JJ.
NORRIS, Judge.
Marcus Hubbard was charged by bill of information with distribution of cocaine, La. R.S. 40:967 A. After a bench trial the District Court found him guilty as charged and denied his subsequent motion for new trial. The court sentenced him to 10 years at hard labor. Hubbard appeals his conviction and sentence, advancing four assignments of error. For the reasons expressed, we affirm.

Factual background
Hubbard's arrest was part of an undercover drug interdiction operation conducted by the Richland Parish Sheriff's Office. Deputies Perry Fleming and Terry Watson were investigating their target, suspected drug dealer Sam Thurman. On January 13, 1996, the deputies used a confidential informant ("CI") and an undercover officer, Monroe Police Officer Harry Cain, to make contact with Thurman and attempt to buy $150 of cocaine. Cain and the CI went to Thurman's house on Naylor Street to negotiate the sale, while Deputies Fleming and Watson maintained surveillance. While the CI spoke with Thurman in the carport, the defendant, Marcus Hubbard, came out of the house and spoke to a bystander; Cain heard Hubbard say, "I'll have some in a few minutes."
*395 The CI returned to Cain's car and advised him that Thurman instructed them to go to the local washateria and wait. Thurman and Hubbard got into Thurman's car, a white Lincoln, and drove off. Cain advised the deputies of their intended destination via radio, and then proceeded to the washateria. The deputies also drove to the area, parking about one block south of the washateria to maintain visual surveillance.
Shortly after they arrived, Cain saw Thurman and Hubbard drive up. According to Cain, Hubbard exited the Lincoln, walked to the passenger side of Cain's car, and handed him the drugs, saying, "Here it is." Hubbard then walked around to the driver's side, and Cain asked, "Well, if I decide to buy a larger amount from Sam later, would he sell it to me?" Hubbard replied, "Yes, he would." Cain could not recall if he was "wired," i.e., wearing an audio transmitter; however, he identified Hubbard as the person who actually handed him the cocaine.
Deputy Fleming testified that he knew Hubbard from prior encounters; he watched as Hubbard walked up to the driver's side of Cain's car and exchanged the drugs for money. Deputy Fleming recalled that Cain was in fact wired, but that the tape of the encounter was mostly inaudible. Deputy Watson also recalled that Cain was wired but the tape very distorted and unusable. Deputy Watson did not actually see the drugs change hands, but he saw Hubbard walk to Cain's car. He had no doubt that it was Hubbard. Both the deputies and Cain described Hubbard as wearing a white T-shirt and blue jeans.
The officers used special "buy" money which they had photocopied; however, they elected not to arrest Hubbard immediately, lest they prejudice the ongoing investigation. When Hubbard was arrested in August 1996, none of the buy money was recovered.
The defense was principally one of alibi. Deanna Hubbard, defendant's sister, testified initially that he was with his family in Houston, Texas, between January 13-15, 1996, for the Martin Luther King Jr. Day celebration. On cross examination, however, she admitted that the family celebration was actually only on Sunday and Monday, January 14-15, and that Houston is roughly a 6½ hour drive from Rayville.[1] Hubbard testified on his own behalf that if the arresting officers had given him "due process," he could have proved that he was in Houston at the time of the offense. He sought to corroborate this by introducing, over the State's objection, a "gold card" application that he filed with the Harris County (Texas) Hospital District on January 16, 1996, three days after this offense. He also introduced a letter from the Social Security Administration stating that another sister, Yalonda Hubbard, had phoned regarding his eligibility for SSI on January 12, 1996, one day before the cocaine sale. Over the State's objection, Hubbard testified that this letter showed he was present at his sister's apartment in Houston when she spoke to the Social Security agent.[2]
At the close of the evidence, the District Court charged itself with the law and stated that it found Hubbard guilty as charged, beyond a reasonable doubt.

Discussion: Sufficiency of evidence
By his first assignment of error Hubbard contends the evidence was insufficient to support the verdict of distribution of cocaine.
The appellate standard of sufficiency is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This due process standard does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess credibility or re-weigh evidence. State v. *396 Smith, 94-3116 (La.10/16/95), 661 So.2d 442. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support the requisite factual finding. State v. Braswell, 605 So.2d 702 (La.App. 2 Cir.1992), and citations therein; State v. Gradick, 29,231 (La. App. 2 Cir. 1/22/97), 687 So.2d 1071.
When the defendant asserts that he was not the perpetrator, or he remains silent, the State bears the burden of negating any reasonable probability of misidentification. State v. Powell, 27,959 (La.App. 2 Cir. 4/12/96), 677 So.2d 1008 (on rehearing), writ denied 96-1807 (La.2/21/97), 688 So.2d 520.
The crime of distribution of cocaine occurs when any person knowingly or intentionally distributes, physically delivers or administers cocaine, a Schedule II CDS. La. R.S. 40:967 A(1). The defendant is guilty of this offense when he transfers possession or control of cocaine to his intended recipients. State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132.
Hubbard contends that the testimony of the State's witnesses was inconsistent as to the details of the offense and inconclusive as to his identification. He cites Officer Cain's initial testimony that he was not wired, and his later inability to recall whether he was wired; he contrasts this with the deputies' positive testimony that Cain was indeed wired, though it yielded a garbled tape. Hubbard also contrasts Cain's testimony that the person who delivered the cocaine walked to the passenger side of his vehicle, with Dep. Fleming's testimony that the person walked to the driver's side. Notably, Cain also testified that the defendant "passed around to" the driver's side of the car before returning to Thurman's Lincoln. Hubbard further contends that although Deps. Fleming and Watson seemed to know the defendant from prior dealings, they did not claim to be "well acquainted" with him, and Officer Cain did not know him at all. Nevertheless, all three positively identified Hubbard at trial as the person who delivered the cocaine.
The testimonial discrepancies cited by Hubbard are, in our view, fairly minuscule and do not create "internal contradiction" sufficient to undermine the witnesses' uniform testimony that Hubbard delivered cocaine to an undercover officer in exchange for $150. State v. Moore, 29,212 (La.App. 2 Cir. 1/22/97), 687 So.2d 647. Moreover, the claim of misidentification is based only on an assumption that Deputies Fleming and Watson did not know Hubbard well enough to recognize him; their testimony conclusively shows the opposite. The argument is little more than speculation that the deputies might have been in error, and this does not establish any reasonable probability of misidentification. State v. Powell, supra; State v. Harris, 28,517 (La.App. 2 Cir. 8/21/96), 679 So.2d 549, writ denied 96-2954 (La.9/26/97), 701 So.2d 975.
Hubbard finally contends that his alibi evidence negates his participation in the crime. Ultimately, however, Deanna Hubbard could state only that her brother was in Houston on Sunday and Monday, January 14-15, and not on the date of the offense, January 13. Likewise, the "gold card" application tends to show that he was in Houston on January 16, three days after the offense.[3] Even if this evidence proves everything that Hubbard contends, it does not make his involvement in the crime a physical impossibility. The record shows that Houston is a 6½ hour drive from Rayville; the District Court could rationally accept Deanna's testimony and the documentary evidence, and still find that Hubbard committed the crime before returning to Houston. See State v. Brown, 588 So.2d 1317 (La.App. 2 Cir.1991), writ denied 592 So.2d 1298 (1992). We see no basis for disturbing the court's reasonable resolution of the evidence.
*397 In short, viewed in the light most favorable to the State, the evidence proves, beyond a reasonable doubt, every element of the offense and the identity of Hubbard as the perpetrator. This assignment lacks merit.

Motion for new trial
By his fourth assignment of error Hubbard urges the District Court erred in denying his motion for new trial.
Motions for new trial are regulated by La.C.Cr.P. art. 851, which provides in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever: * * *
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty[.]
To obtain a new trial based on newly discovered evidence, the defendant must show (1) the new evidence was discovered after trial, (2) the failure to discover it at the time of trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) it is of such a nature that it would probably have produced a different verdict. State v. Hammons, 597 So.2d 990 (La.1992), and citations therein. The District Court has much discretion in ruling on a motion for new trial; denial of the motion will not be reversed absent a showing of clear abuse of that discretion. State v. Knapper, 555 So.2d 1335 (La.1990). The District Court's duty is not to weigh the new evidence like a jury determining guilt or innocence; rather, it is to ascertain whether there is new material fit for a new jury's judgment. State v. Prudholm, 446 So.2d 729 (La.1984).
The Supreme Court has ordered a new trial when, after the defendant was convicted, a third person confessed to the crime, and other circumstances were present to cast doubt on the defendant's guilt. State v. Hammons, supra. On the other hand, courts are generally skeptical when after the defendant has been found guilty, another participant in the crime makes a statement exculpating the defendant. See, e.g., State v. Perique, 340 So.2d 1369 (La.1976); State v. Bell, 242 La. 585, 137 So.2d 342 (1962) (on rehearing); State v. Ruffin, 475 So.2d 1375 (La.App. 5 Cir.1985). The Supreme Court has expressed doubt whether the testimony of another participant, who invokes the right against self incrimination, is really "available" for purposes of a new trial motion. State v. Bice, 407 So.2d 1234 (La.1981).
The thrust of Hubbard's motion for new trial was as follows. Sam Thurman, the other participant in the drug sale (and Hubbard's uncle), was also charged in this offense. Hubbard's trial was January 21, 1997. Thurman pled guilty to one count of distribution of cocaine in March and then told his attorney that Hubbard was not involved in the incident. Thurman was subsequently sentenced. Later, at the hearing on Hubbard's motion for new trial, Thurman took the stand and said that Hubbard was not involved in the crime; he implicated a person named Patrick Cooks. On cross examination, however, Thurman refused to incriminate himself in the offense; the State vigorously argued that his testimony would thus be inadmissible at trial because he would invoke his privilege against self incrimination. Also in support of the motion for new trial Hubbard called Deputies Watson and Fleming. They both acknowledged that after Hubbard's trial, Thurman implicated someone else; however, they both knew Cooks and were certain that it was Hubbard, and not Cooks, who delivered the cocaine on January 13, 1996. Dep. Fleming was very specific that Cooks is taller and larger than Hubbard.
At the close of evidence the District Court stated that the eyewitnesses all clearly identified Hubbard as one of the perpetrators; in fact, the evidence against him was "overwhelming." *398 The court commented that Thurman had a motive to exonerate his nephew, and would probably not have been allowed to testify because he invoked the Fifth Amendment; but even if these problems were not present, Thurman's testimony "would not have had a real impact on my decision making."
In brief Hubbard criticizes the District Court for "assuming that because he believed Sam Thurman not to be credible that the testimony would not change the outcome of a trial in front of a second, impartial jury." Br., 10. In effect, however, the court properly questioned whether the newly discovered evidence was of such a nature that it would probably produce an acquittal in the event of retrial. State v. Prudholm, supra. Unlike in State v. Hammons, supra, the eyewitness testimony identifying Hubbard as the culprit was strong and consistent, and Hubbard's alibi evidence was weak and inconclusive. The deputies testified that they would not change their identification of the defendant. The District Court was entitled to find that Thurman's story, lacking the normal indicia of reliability, would likely not have affected the verdict.
We perceive no abuse of discretion. This assignment lacks merit.

Excessive sentence
By his second and third assignments, Hubbard contends the District Court erred in denying his motion to reconsider sentence and in imposing an unduly harsh and excessive sentence.
The District Court has wide discretion to sentence within statutory limits; absent a showing of manifest abuse of discretion, the appellate court will not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Thompson, 25,583 (La.App. 2 Cir. 1/19/94), 631 So.2d 555. Appellate review for excessiveness is a two-step process. First the record must show that the District Court adequately considered the criteria of La.C.Cr.P. art. 894.1. State v. Smith, 433 So.2d 688 (La.1983). The goal of art. 894.1 is a sufficient factual basis for sentence. State v. Lanclos, 419 So.2d 475 (La.1982).
The second step is to examine the circumstances of the offense and offender. A sentence is constitutionally excessive if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless imposition of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La. 1985).
In sentencing Hubbard the District Court thoroughly restated his social and work history from the pre-sentence investigation report ("PSI"); Hubbard did not contest these details, and we need not repeat them here. The court also related Hubbard's criminal history, including a 1991 conviction in Texas for carrying an unlawful weapon; a 1995 arrest in Richland Parish for attempted second degree murder, reduced to assault by drive-by shooting, for which he received one year at hard labor, was released in October 1995, and was still on probation when the instant offense occurred; and a July 1996 detainer from Texas for possession of controlled dangerous substances ("CDS"). The court viewed several letters written on Hubbard's behalf as mitigating, but recited the art. 894.1 factors item-by-item, with the conclusion that these presented no mitigating factors.
Despite the District Court's extensive compliance with art. 894.1, Hubbard contends that his problems with the law are all recent, and do not negate a prior law-abiding life in which he ran a barber shop for several years and contributed to society. He shows that his parole officer, Mr. Miller, had granted him informal 30-day extensions to stay in Texas for up to six months. He also argues that this offense was a single incident involving a small amount of cocaine. He finally contends that his uncle, Sam Thurman, was the actual distributor, while Hubbard was merely a delivery man.
*399 The District Court properly found that Hubbard committed this offense while on probation, thus tarnishing the prospect of rehabilitation. The court also found that Hubbard has a pending CDS charge in Texas, suggesting that the instant offense may not have been an isolated incident. The court aptly mentioned the grave threat posed by distribution of cocaine. On this record, we do not conclude that the District Court assessed the sentencing criteria improperly, or that he imposed a disproportionate sentence. Ten years at hard labor[4] for this offense and offender does not shock our sense of justice.
These assignments lack merit.

Conclusion
For the reasons expressed, Marcus Hubbard's conviction and sentence are AFFIRMED.
NOTES
[1] The court took judicial notice that the MLK federal holiday was January 15, 1996. R. p. 244.
[2] The defense also elicited testimony from a jailer, Deputy Allen, that Hubbard may have been seen at the Waffle House in Rayville, either "during the time" the crime was committed or "during that time period." R. pp. 194, 197.
[3] Additionally, the Social Security letter shows that an SSA agent spoke to Yalonda Hubbard on January 12, one day before the offense, about the defendant's disability claim. However, the letter does not show that Hubbard himself was present when the call was made; to the contrary, the fact that the letter requests additional information from Hubbard himself suggests that he was not around to answer the SSA agent's questions himself on that date. Hubbard submitted the requested information on February 1.
[4] Subsequent to this offense the legislature amended the penalty for distribution of cocaine. La. Acts 1997, No. 1284, § 1, effective August 15, 1997. In prosecutions arising after that date, five years of the sentence imposed must be without benefit of parole, probation or suspension of sentence. La. R.S. 40:967 B(4)(b).