742 So.2d 91 (1999)
STATE of Louisiana, Appellee,
v.
Billy CALDWELL, Appellant.
No. 32,377-KA.
Court of Appeal of Louisiana, Second Circuit.
September 22, 1999.
*94 Peggy J. Sullivan, Louisiana Appellate Project, Counsel for Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, D. Brian Harkins, Asst. Dist. Atty., Counsel for Appellee.
Before NORRIS, GASKINS and PEATROSS, JJ.
NORRIS, Chief Judge.
The defendant, Billy Caldwell, was charged with three counts of distribution of cocaine, La. R.S. 40:967, and one count of conspiracy to distribute cocaine, La. R.S. 40:979. A jury found him guilty as charged on all four counts. The District Court sentenced him to a total of 15 years at hard labor, including a portion without benefit of probation, parole, or suspension of sentence. Caldwell now appeals, urging several assignments of error. We affirm.

Background
Upon receiving information that drug trafficking, prostitution, and other crimes were being committed at the Grotto Motel in West Monroe, the Ouachita Parish Metro Narcotics Unit ("Metro"), under the direction of Officer David May of the West Monroe Police Department, conducted an undercover investigation there, targeting several individuals including Caldwell. As part of that operation, Officer Freddy Mercer, then a Caldwell Parish Sheriffs Deputy, made separate undercover purchases of crack cocaine from Caldwell on January 14, 15 and 21, 1998. Not long thereafter, an arrest warrant was issued for him. Metro officers executed that warrant on January 30, 1998 at Room 22 of the Grotto Motel where they found two rocks of crack cocaine.
On March 16, 1998, the State filed a bill of information charging Caldwell with three counts (1,2, & 3) of distribution of cocaine, a Schedule II Controlled Dangerous Substance ("CDS"), La. R.S. 40:967 A, one count (4) of conspiracy to distribute cocaine, La. R.S. 40:979, and one count (5) of possession of cocaine, La. R.S. 40:967 C. Caldwell proceeded to jury trial on the first four counts on August 25, 1998 and was found guilty as charged on all of them.[1] Following the denial of his motions for post verdict judgment of acquittal and preparation of a pre-sentence investigation ("PSI"), the district court sentenced Caldwell to 10 years at hard labor with the first five years to be served without benefit of probation, parole, or suspension of sentence on counts 1 and 2; to five years at hard labor, all without benefit on count 3; and to five years at hard labor on count 4. The court ordered that counts 1, 2, and 4 run concurrent with each other but consecutive to count 3 for a total sentence of 15 years hard labor. After the denial of a timely motion for reconsideration of sentence, this appeal ensued urging assignments *95 of error relative to sufficiency of the evidence and excessiveness of sentence.

Discussion: Sufficiency of the evidence
By his first two assignments, Caldwell urges the evidence is not sufficient to support any of his convictions. In particular, he challenges his identification by the undercover officer during all three buys as well as the evidence regarding any conspiracy between him and others to distribute cocaine during the January 14 illegal incident. We find no merit in these arguments.
When a defendant challenges both the sufficiency of evidence and one or more other trial errors, the appellate court should first resolve the sufficiency challenge. State v. Hearold, 603 So.2d 731 (La.1992); State v. Evans, 29,675 (La.App. 2 Cir. 9/24/97), 700 So.2d 1039, writ denied 97-2942 (La.1/9/98), 705 So.2d 1121. The constitutional standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132. This standard, initially enunciated in Jackson and now legislatively embodied in La. C.Cr.P. art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Smith, 441 So.2d 739 (La. 1983); State v. Harris, 28,517 (La.App. 2 Cir. 8/21/96), 679 So.2d 549, writ denied 96-2954 (La.9/26/97), 701 So.2d 975. This standard does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess credibility of witnesses or re-weigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
When the defendant asserts that he was not the perpetrator, or he remains silent, the State bears the burden of negating any reasonable probability of misidentification. State v. Powell, 27,959 (La.App. 2 Cir. 4/21/96), 677 So.2d 1008 (on rehearing), writ denied 96-1807 (La.2/21/97), 688 So.2d 520. Even so, the appellate court must not substitute its opinion of the facts for that of the jury. It is the province of the jury to resolve conflicting inferences from the evidence. State v. Free, 26,267 (La.App. 2 Cir. 9/21/94), 643 So.2d 767, writ denied 94-2846 (La.3/10/95), 650 So.2d 1175; see also, State v. Davis, 97-331 (La. App. 3 Cir. 10/29/97), 702 So.2d 1014, writ denied 97-2990 (La.11/6/98), 726 So.2d 919. Thus, upon review we must consider all the evidence in the light most advantageous to maintaining a verdict. State v. Free, supra. Furthermore, in the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a defendant's conviction. State v. Braswell, 605 So.2d 702 (La.App. 2 Cir.1992), and citations therein; State v. Gradick, 29,231 (La.App. 2 Cir. 1/22/97), 687 So.2d 1071. This is equally applicable to the testimony of undercover drug agents. State v. Anderson, 30,306 (La.App. 2 Cir. 1/21/98), 706 So.2d 598; State v. Martin, 29,717 (La.App. 2 Cir. 9/24/97), 702 So.2d 739, writ denied 97-2562 (La.1/30/98), 709 So.2d 703; State v. Daniels, 607 So.2d 620 (La.App. 2 Cir. 1992). So too, the testimony of a single undercover police officer is sufficient to convict one charged with distribution of drugs. State v. Anderson, supra; State v. Martin, supra; State v. Harris, supra; State v. Daniels, supra.
La. R.S. 40:967 makes it unlawful for any person knowingly or intentionally, among other acts, to distribute cocaine, a Schedule II CDS. State v. Baker, 28,152 (La.App. 2 Cir. 5/8/96), 674 So.2d 1108, writ denied 96-1909 (La.12/6/96), 684 So.2d 925. A defendant is guilty of distribution of cocaine when he transfers possession or control of the cocaine to his intended recipients. State v. *96 Cummings, supra; State v. Manning, 30,809 (La.App. 2 Cir. 6/24/98), 715 So.2d 668; State v. Hubbard, 30,604 (La.App. 2 Cir. 4/8/98), 711 So.2d 393. The State must show (1) "delivery" or "physical transfer"; (2) guilty knowledge of the controlled dangerous substance at the time of transfer; and (3) the exact identity of the controlled dangerous substance. State v. Manning, supra.
A criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing a crime, where at least one of the conspirators does an act in furtherance of the scheme. La. R.S. 14:26. A prima facie case of conspiracy is presented by introduction of evidence which, if unrebutted, is sufficient to establish the fact of conspiracy. State v. Daniels, supra and authorities therein. The elements of conspiracy may be proven by direct or circumstantial evidence. Id. Assuming every fact to be proved that the evidence tends to prove, the evidence must exclude every reasonable hypothesis of innocence in order to convict by circumstantial evidence alone. La. R.S. 15:438. Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a question of law. State v. Shapiro, 431 So.2d 372 (La.1982); State v. Daniels, supra.
Circumstantial evidence is defined as evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Lilly, 468 So.2d 1154 (La.1985); State v. Daniels, supra. Nonetheless, the circumstantial evidence rule of La. R.S. 15:438 does not establish a stricter standard of review than the more general Jackson v. Virginia formula, but a hypothesis of innocence that is sufficiently reasonable and strong must necessarily lead a rational fact finder to entertain a reasonable doubt about guilt. State v. Daniels, supra and authorities therein.
At trial, the State presented the testimony of Officer May, the case agent for the investigation; Deputy Mercer, the undercover agent; and Susan Rutledge, the crime laboratory expert who analyzed the purchased crack cocaine.
Officer May described his experience in drug trafficking and undercover operations. He testified that he received information that drug sales and other illicit activities were occurring at the Grotto Motel. Metro therefore launched an undercover operations there targeting several people, including Caldwell.
May testified that he used Deputy Mercer as the undercover agent for each of the three sales, January 14, 15 and 21, 1998. He "wired" Mercer with a body mike audio transmitter; he not only monitored Mercer's activities but recorded the transmissions with a UNITEL recorder. Each time before sending him in, May briefed Mercer about the investigation, and at the beginning showed him a photo of Caldwell (which was placed in evidence by the State). Also, before each sale May gave Mercer $20.00 in prerecorded "buy" money and instructed him to attempt to buy cocaine from Caldwell.
Deputy Mercer described each transaction in great detail, and was largely corroborated by Officer May. On January 14, Mercer arrived at the door of Room 22; a white woman opened it and he came in. Four people were in the room, including Caldwell. When he asked Caldwell to "hook him up with a twenty" (street slang for a rock of cocaine worth $20), Caldwell and another black male went into the kitchen area. About two minutes later, they returned and, without saying anything, Caldwell placed two tiny rocks in the white woman's hand. She walked to Mercer, placed the CDS in his hand, and took the money from him. Mercer then left, met May at a pre-arranged location away from the Grotto, and turned over the *97 suspected crack. May played the tape of this transaction for the jury, stating that it was poor because of the number of people in the room, but Dep. Mercer played it a second time, stopping it and giving explanations.
On January 15, after the briefing with Officer May, Dep. Mercer returned to the Grotto and knocked at Room 22. This time Caldwell answered, and Mercer again asked to "hook him up with a twenty." Caldwell motioned him into the room, reached out his hand for money, and then left. A short while later, he returned with the money and said he could not find any crack. Mercer turned to leave, and even got into his car, but Caldwell flagged him down and told him to return to the room. Mercer complied; Caldwell took the money, left, returned a minute or so later, and placed a small rock of crack in Mercer's hand. Mercer then left and turned over the suspected CDS to Officer May at another pre-arranged meeting place. At trial, the tape of this transaction was played twice. Like the first, it is generally poor, but in a very clear passage, immediately after the sale, Dep. Mercer dictated a description of Caldwell into the microphone. He had not been shown the defendant's picture before this purchase.
On January 21, Dep. Mercer went to the Grotto's office, met Caldwell and two other black males, and asked Caldwell for a twenty. Caldwell nodded, went with one of the men through a door, and held a conversation which Mercer could see but not hear. The men then returned, and Caldwell stood in the doorway. He motioned Mercer to come through, then nodded to a shelf where Mercer found a piece of crack. Mercer picked it up and handed the money to Caldwell. After joking with the men in the office, Mercer left and met May to turn over the suspected crack. The tape of this transaction was placed twice for the jury. Like the others it is of poor quality, but both officers explained this is not uncommon, as "wires" are chiefly intended for the officer's safety in the event something went wrong. Also, Dep. Mercer supplemented the tape with voiceover commentary.
Mercer positively identified Caldwell as the person who sold him crack cocaine on all three occasions. He pointed him out in open court and stated he had no doubt as to his identity. On cross examination, he admitted he had never seen Caldwell prior to January 14, 1998. He also admitted that he heard someone call the seller "Billy Jack," yet he knew Caldwell's middle initial is "M." He also admitted that on the January 15 tape, he may have referred to Caldwell's room as "Room 2." He further admitted that even though the police report showed he had made two purchases that day, including one from a female target, he could not recall the other buy. On redirect, however, he reiterated that he specifically recalled buying crack from Caldwell and he reaffirmed his identification.
Officer May testified that when Caldwell was arrested on January 30, none of the prerecorded money was recovered. He explained this was common when agents wait several weeks to make arrests to avoid compromising an ongoing investigation. Officer May also detailed the chain of custody of the suspected CDS obtained in these three transactions, and their ultimate delivery to the lab for analysis. He testified that lab reports from the North Louisiana Crime Lab matched the rocks that he had submitted for analysis. Susan Rutledge, the expert from the crime lab, testified that she had examined each of the submitted items and found them to contain cocaine.
Caldwell testified on his own behalf as his only witness. He stated that he was manager of the Grotto Motel, and also operates and repairs pool tables, juke boxes and video games. He saw Mercer at the motel on the dates in question, but contended he knew he was a police office, having met him while doing some work at the Caldwell Parish Sheriffs Department, repairing their vending machines and covering *98 the sheriffs pool table. Thus, he maintained, he would never have sold Mercer cocaine.
Caldwell further testified that he did not own a white car mentioned as his in the audio tapes,[2] and denied that he wore the kind of clothes described by the officer. He recognized, nevertheless, various voices on the tapes: Mitzi, Chuck, Cheryl and Joe. He added that the "Joe" heard on all three tapes is Joe Triplet, his first cousin, who "closely resembles" him. He explained that he was letting these people use his room, No. 22, to stay in and watch TV.
He denied that he was present in Room 22 on January 14 and 15 when those transactions took place, but rather was in the office watching the participants coming and going from the room. He admitted he was present in the office for the January 21 transaction, but denied that he was involved in it.
On cross examination Caldwell could not explain why any of the persons he said were present on January 14 or 15and could presumably confirm that he was not therefailed to testify on his behalf. He said that two of them were now in jail and probably would not testify for him, as they are only "friends on the street" and suffer from "selective amnesia." He did not know the whereabouts of his cousin, Joe Triplet. As for the January 21 transaction, Caldwell stated that it was Joe, Chuck and Mercer who went into the laundry room while he (Caldwell) remained in the office; his voice was on the tape only because he was behind the counter, where his job required him to be.
Caldwell also contended that Mercer identified him in court only because Officer May had pointed him out minutes earlier, being escorted down the hall. He reiterated that he and his cousin Joe look almost exactly alike, except that one of them is bald. This, Caldwell insisted, is why Dep. Mercer misidentified him from the photo placed in evidence. He admitted that the photo in evidence was really of him, but contended that the Polaroid self-developing image was a double exposure: "That's a picture within a picture. That's a double-take on that picture."
On rebuttal, Dep. Mercer again identified the photo as the one he had been shown before and after the first buy; his initials were on the back. He was certain the person in the photo was the same person who sold him crack on all three occasions. He added that during his tenure in the Caldwell Parish Sheriffs Department, he had never met anyone named Billy Caldwell and he was unaware the department had a pool table or pinball machine. Finally, he denied that Officer May pointed out the defendant to him as they waited to testify.
Viewing all the evidence in the light most favorable to the state, the jury could have concluded beyond a reasonable doubt that Caldwell sold crack cocaine to Dep. Mercer on January 14, 15 and 21, 1998. The testimonial discrepancies cited in brief are, in our view, minor and do not create "internal contradiction" sufficient to undermine the witnesses' uniform testimony that defendant delivered crack cocaine to an undercover officer in exchange for $20 on three separate occasions. In fact, much of the testimony is confirmed by the tapes which, by Caldwell's own admission, captured his own voice; the jury had the opportunity to compare the voice on the tapes and Caldwell's voice in court. Finally, we are not persuaded by the claim that Dep. Mercer misidentified the person who sold him the cocaine. The argument is little more than speculation that the undercover agent might have been in error; his testimony and the evidence shows the opposite. See, State v. Hubbard, supra. Notably, as is within its discretion, the jury chose to reject Caldwell's version of events, the only evidence of his innocence, as well as his improbable contention that *99 persons who were never subpoenaed to testify could have verified his story.[3]
Likewise, the evidence of the conspiracy charge could have persuaded a rational fact finder beyond a reasonable doubt that there was an agreement or combination of minds between Caldwell and the white female to distribute cocaine when they combined to pass the cocaine from Caldwell to Mercer. The white female opened the door to let Mercer in, waited while defendant got the cocaine, transferred it from defendant to Mercer, and then, importantly, received the money. Additionally, Mercer testified that there was a good deal of non-verbal communication between the female and Caldwell. As described by Dep. Mercer, the January 14 drug transaction obviously involved much more than a person who "had short arms or did not feel like walking closer to the other person" as alleged in brief. The jury could infer from these actions that each participant knew precisely what was expected of him by the other, such that oral communication between them was unnecessary. See, State v. Daniels, supra. Thus, we reject the argument that the state presented no evidence that Caldwell conspired with others to distribute cocaine on January 14, 1998.
Accordingly, the record is sufficient to find beyond a reasonable doubt every essential element of the offenses of distribution of cocaine and conspiracy to distribute cocaine. These assignments lacks merit.

Excessive sentence
By his third assignment, Caldwell challenges the combined 15 year hard labor sentence on his four count conviction. He contends the sentences are clearly excessive when taken with the actual facts of the offenses and his personal history.
In reviewing claims of excessiveness, an appellate court uses a twopronged analysis. First, the record must show that the district court took cognizance of the criteria set forth in La.C.Cr.P. art. 894.1. The court is not required to list every aggravating or mitigating circumstance, as long as the record shows an adequate consideration of the guidelines. State v. Smith, 433 So.2d 688 (La.1983); State v. Adger, 30,215 (La.App. 2 Cir. 12/10/97), 707 So.2d 1000. The objective of article 894.1 is the articulation of a factual basis for sentence, and not rote recitation of the guidelines. When the record clearly shows an adequate factual basis for sentence, remand is not necessary. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Adger, supra.
The second prong is constitutional excessiveness. A sentence violates La. Const. art. I § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is deemed grossly disproportionate if, when the crime and punishment are weighed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Adger, supra. A district court has wide discretion to sentence within the statutory limits, and such a sentence will not be set aside as excessive absent a manifest abuse of that discretion. State v. Square, 433 So.2d 104 (La. 1983); State v. Lindsey, 28,016 (La.App. 2 Cir. 4/3/96), 671 So.2d 1155. In selecting a proper sentence, the trial court is not limited to considering only the defendant's prior convictions but may properly review all prior criminal activity. State v. Walker, 573 So.2d 631 (La.App. 2 Cir.1991).
At sentencing, the District Court set forth long and thorough reasons for his sentence, citing the PSI, defendant's personal history, and the circumstances of the *100 convicted offenses. First, the court noted that Caldwell was 58 years old at the time of sentencing and specified the crimes for which he had been convicted. The court then considered his social history: a normal and happy upbringing by his parents without abuse or neglect, graduation from high school with no problems, service in the military where he obtained the rank of E6 Drill Sergeant with a field artillery unit and served in Vietnam, earning a B.S. degree in Math and Computer Science Repair by correspondence courses while in the military, three marriages with the last ending in 1994, and having five children and one grandchild, all scattered throughout the country. Also, while noting Caldwell was a first time felony offender whose juvenile record was unavailable, the court detailed his extensive criminal history including: misdemeanor convictions for contempt of court, failure to register vehicle, no proof of insurance, following too close, theft by shoplifting, simple battery, expired inspection sticker, driving under suspension, resisting arrest, and discharging a firearm; and arrests for theft by check, unauthorized use of a motor vehicle, and failure to return a leased moveable. The court also took particular note that all but one of the prior offenses occurred very recently and after defendant's 1994 divorce from his third wife as well as the fact that he was on supervised probation for the firearm charge at the time of the current offenses.
Commenting upon other information in the PSI, the court mentioned that Caldwell denied use of cocaine or marijuana to the probation officer who prepared the report, yet he admitted that he felt like he did not sell any cocaine because he gave it to the white female who in turn gave the cocaine to the officer. Caldwell also indicated as part of the PSI that after 1994 most of his retirement money went to his children. This led the probation officer to believe Caldwell sold drugs to make ends meet after he retired, a factor the court considered in mitigation.
As for the present offenses, the court considered defendant's age, the fact he was a first felony offender and his good history until 1994 as mitigating factors. Nonetheless, the court noted the seriousness of the offense of distribution. The Grotto Motel was an "open air drug market," Caldwell was the manager of the location, and actively participated in the illegal activities. The court also looked at his lack of remorse for the crimes he committed in the community, specifically that Caldwell still had cocaine in his room when he was arrested. The court was unfavorably impressed that Caldwell had lied on the witness stand when his first story fell apart, all in the effort to avoid punishment.
Finally, the court considered the various sentencing guidelines, particularly defendant's continuous conduct of distributing cocaine as evidenced by the three separate purchase made by the officers; the significant risk such activity posed to the community; and defendant's lack of remorse, motive for monetary gain and abuse of his position as motel manager. While again noting his first felony offender status, the court believed this was not his first time selling cocaine and had confidence the activity would likely recur based on Caldwell's failure to take responsibility for his actions and the pattern of dealing revealed by the investigation. In sum, the court found defendant was in need of a correctional institution in order to protect the public and that any lesser sentence would deprecate the seriousness of the offense.
Reviewing the record as a whole, we do not find the sentences imposed by the district judge to be excessive. On each count of distribution of cocaine, the defendant faced a minimum sentence of five years and a maximum of 30 years, the first five years of which are to be served without benefit, and a fine of up to $50,000 on each count. La. R.S. 40:967 B(4)(b). On the conspiracy count, defendant faced imprisonment and a possible fine not to exceed one-half of the above punishment. La. R.S. 40:979. Thus he faced a total *101 sentencing exposure of 105 years at hard labor and up to $175,000 in fines. Nonetheless, the longest sentence received on any individual count was one-third the maximum allowable for only one conviction and a total sentence of only one-half that amount on the combined sentences. Moreover, the decision to impose a consecutive sentence on one of the counts is well within the discretion of the trial judge under La.C.Cr.P. art. 883 and is not excessive on this record.
Simply put, these combined sentences, three concurrent and one consecutive, do not shock our sense of justice for this mature drug dealer. Therefore, they are not excessive.[4]

Conclusion
For the above reasons, Billy Caldwell's convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] The sentencing hearing transcript reveals that the fifth count for possession of cocaine was severed prior to trial and eventually dismissed.
[2] The reference to Caldwell's car is not clear from this court's review of the audio tapes.
[3] Similarly, the court at sentencing commented on the improbable nature of Caldwell's testimony, which he tried to "beef up" as he went along only to see it "unravel" under cross examination by the prosecutor and rebuttal testimony of Deputy Mercer. R.p. 258.
[4] Our review of the record reveals one error patent. On the conspiracy count, the court sentenced him to "five years at hard labor." La. R.S. 40:979 provides that punishment will be "in the same manner" as that for the underlying offense; distribution, the underlying offense, requires five years without benefit. La. R.S. 40:967. This would require a portion of the conspiracy sentence to be without benefit; the court's failure to direct that any of this sentence be served without benefit appears to be illegally lenient. However, because the state failed to appeal, we will not correct the sentence or remand the matter for resentencing. State v. Fraser, 484 So.2d 122 (La.1986); State v. Moore, 26,329 (La.App. 2 Cir. 08/17/94), 642 So.2d 679.